# IN THE UNITED STATES DISTRICT COURT

# FOR THE WESTERN DISTRICT OF VIRGINIA

# HARRISONBURG DIVISION

THOMAS RICHARDS

        *Plaintiff,*

    *v.*

ROBERT KIRKMAN,
SKYBOUND ENTERTAINMENT, INC.,
(a Delaware corporation; )
IMAGE COMICS, INC.,
(a California corporation; );
SCOPELY, INC., (a Delaware corporation;
TELLTALE GAMES/LCG ENTERTAINMENT

        *Defendants*

Case No. 5:25-cv-00089

Lisa Weingarten Richards, Esq.
VSB #96671
LWR Law Offices
3060 Williams Dr
Ste 300 #510
Fairfax, VA 22031
*Tel.:* (202) 981-2059
lwr@lwrlawoffices.com
*Counsel for plaintiff*

## PLAINTIFF OPPOSITION TO LCG'S MOTION TO DISMISS

**TABLE OF CONTENTS**

I. INTRODUCTION ......................................................................................4

  A. The Threshold Question LCG Refuses to Answer—And Its Own Website

  Contradicts Its Motion ..........................................................................4

  1. LCG's Website Claims Credit for Walking Dead ...............................4

  2. Specific Question LCG Won't Answer...............................................4

  3. LCG's Credibility Problem Makes Discovery Essential ....................5

  4. Industry Practice Supports Trademark Licensing Inference ..................8

  5. This Proves Plaintiff's Claims Are Not Frivolous ...................................9

  6. Discovery Will Resolve the Question ........................................................9

  B. The Corrected Data Combined with Kirkman's Admitted Pattern

  Proves Plausibility ...............................................................................10

  C. Kirkman's Conspicuous Silence -- And LCG's Improper Attempt

  to Hide Behind It ..................................................................................11

  D. LCG's Corporate Shell Game .............................................................12

II. THRESHOLD PROCEDURAL ISSUE: IF THE COURT CONSIDERS
LCG'S EXTRINSIC DOCUMENTS, THE MOTION MUST BE CONVERTED
TO SUMMARY JUDGMENT AND PLAINTIFF IS ENTITLED TO
RULE 56(d) DISCOVERY ....................................................................14

III. PRELIMINARY STATEMENT: LCG'S IMPROPER REQUESTS ..................16

  A. LCG's Request for Attorneys' Fees Is Without Merit ................................17

  B. LCG Improperly Incorporates "Other Defendants' Arguments"

  By Reference .......................................................................................18

IV. STATEMENT OF FACTS .......................................................................20

  A. What LCG Admits By Omission ..........................................................20

  1. The Character Exists and Is Defamatory .............................................21

  2. The "Of and Concerning" Connection .................................................21

  3. Ongoing Commercial Exploitation ......................................................21

  4. Harm to Plaintiff .................................................................................22

  5. LCG's Certificate of Good Standing Is Irrelevant ...............................23

  B. LCG's Relationship with The Walking Dead ........................................23

  1. LCG Owns and Operates as "Telltale Games" ....................................23

  2. The "Telltale" Brand Was Built By Walking Dead ..............................24

  3. What LCG Actually Acquired .............................................................25

  C. The "Telltale" Trademark and Ongoing Commercial Exploitation ..............25

  D. Skybound's Investment in LCG ...........................................................27

E. Current Sales Through 2024-2025 ...................................................................................29

F. What Dan Irish Carefully Avoids Saying ........................................................................30

**V. LEGAL STANDARD** .......................................................................................................32

**VI. ARGUMENT** .................................................................................................................33

A. LCG Has Failed Its Burden Under Rule 12(b)(6) ...........................................................33
1. LCG Concedes All Material Facts ...............................................................................33
2. Corporate Structure Is a Factual Dispute Requiring Discovery ...............................34

B. LCG's "We Didn't Create It" Defense Fails as a Matter of Law .....................................38
1. Va. Code § 8.01-40 Prohibits Ongoing "Use," Not Just Creation .............................38
2. Each Continued Distribution Creates Separate Violation .........................................40

C. LCG Cannot Simultaneously Exploit and Disclaim
Telltale-Walking Dead Connection ...................................................................................43

D. LCG's Reliance on Extrinsic Evidence Requires Either Exclusion
of That Evidence or Conversion to Summary Judgment
With Rule 56(d) Discovery ................................................................................................45
1. Agreement Filed Under Seal Violates Adversarial Process .......................................45
2. Alternatively, If Court Considers the APA, Motion Must Be
Converted to Summary Judgment and Discovery Must Be Permitted .....................46
3. Even If Games Excluded, Trademark Rights Were Not ..............................................49
4. "Excluded from Purchase" ≠ "No Ongoing Commercial Relationship" .....................50

E. Personal Jurisdiction Exists or Discovery Required .......................................................51
1. LCG's Blanket Denials Are Conclusory ....................................................................51
2. Digital Distribution Creates Specific Jurisdiction ....................................................52
3. Distinguished: *Levi v. Twentieth Century Fox* ..........................................................55
4. Trademark Licensing Revenue Derived from Virginia ..............................................56

**VII. CONCLUSION** ...........................................................................................................56

## I.    INTRODUCTION

**A. The Threshold Question LCG Refuses to Answer -- And Its Own Website Contradicts Its Motion**

**1. LCG's Website Claims Credit for Walking Dead**

LCG's motion claims it "has done nothing with respect to The Walking Dead" and "has had no role or involvement." LCG Mem. at 2; Irish Decl. ¶ 20. But LCG's own official website contradicts this sworn statement.

On August 28, 2019 -- just two weeks before the September 10, 2019 release of *The Walking Dead: The Telltale Definitive Series* -- LCG published a press release describing itself:

"LCG Entertainment is a privately held company, headquartered in Malibu with a satellite studio in Corte Madera, California. **LCG Entertainment owns the brand, assets and various IP from the original Telltale Games company.** Formerly an award-winning independent developer and publisher of both original and licensed IP games for every major interactive platform, Telltale Games pioneered the episodic delivery of digital gaming content. Initially founded in 2004, **Telltale won numerous accolades for its best-selling game series, including The Walking Dead**, Batman: The Telltale Series, The Wolf Among Us, Tales from the Borderlands, and more. **LCG Entertainment will be operating and marketing games under the Telltale brand going forward.**"[1]

**LCG cannot have it both ways.** When seeking investment and building its brand, LCG proudly associates itself with Walking Dead. But when sued, LCG claims "nothing to do" with Walking Dead. Either the website is false or the motion is false. Both statements cannot be true.

---

[1] *The New Management Team & Publishing Partner*, TELLTALE (Aug. 28, 2019, 2:57 AM), https://telltale.com/press-release (follow "About LCG Entertainment/Telltale Games" hyperlink).

## 2. Specific Question LCG Won't Answer

LCG's contradiction centers on one factual question that LCG conspicuously refuses to answer: **Does LCG license the Telltale trademark to Skybound for use on Walking Dead products, and if so, does LCG receive compensation?**

Every Walking Dead product sold on digital platforms displays: "**Telltale is a trademark of Telltale, Inc., used with permission."[2]** (Exhibit A)

LCG admits it owns Telltale, Inc. and the Telltale trademark. ("As of 2019, the Telltale brand, assets, and various IP are now owned by LCG Entertainment, operating, and marketing games under the Telltale name. We aren't just a game studio of industry veterans; we are also fans of Telltale's narrative legacy and we want to see it grow bigger – and better – than ever.")[3] The phrase "used with permission" is standard trademark licensing language indicating that the trademark owner has granted permission via licensing agreement, typically involving compensation.[4]

**If discovery shows:**

- LCG licenses the Telltale trademark to Skybound

- LCG receives royalties or licensing fees

- LCG benefits financially from Walking Dead sales

**Then LCG is liable** under Va. Code § 8.01-40 for ongoing commercial "use" of Plaintiff's name.

## 3. LCG's Credibility Problem Makes Discovery Essential

---

[2] *The Walking Dead: The Telltale Definitive Series*, STEAM, https://store.steampowered.com/app/1449690/The_Walking_Dead_The_Telltale_Definitive_Series/ (last visited Nov. 13, 2025); *The Walking Dead: The Telltale Definitive Series*, PLAYSTATION, https://www.playstation.com/en-us/games/the-walking-dead-the-telltale-definitive-series/ (last visited Nov. 13, 2025).
[3] U.S. Trademark Registration No. 3,935,269 (filed Apr. 13, 2011), https://trademarks.justia.com/857/08/telltale-85708454.html; *About Us*, TELLTALE, https://telltale.com/about-us/ (last visited Nov. 13, 2025).
[4] *Trademark Basics*, INT'L TRADEMARK ASS'N, https://www.inta.org/topics/trademark-basics/ (last visited Nov. 13, 2025).

Ordinarily, courts evaluate motions based on the credibility of factual representations. But LCG has destroyed its own credibility through material misrepresentations.

**First, LCG's website directly contradicts its motion.** LCG's website highlights "The Walking Dead" as one of Telltale's "best-selling game series" and states LCG will be "operating and marketing games under the Telltale brand." Yet LCG's CFO declares under penalty of perjury that LCG "has done nothing with respect to The Walking Dead." Irish Decl. ¶ 20.

**Second, LCG cited a non-existent website and fabricated statistics by over** 62,000%**.** LCG claims "at least 33,487 people" share Plaintiff's name, citing www.howmanyofme.com as its source. LCG Mem. at 1, 3, 13. LCG provides this false statistic three times, using it as the foundation of its argument that identification is impossible.

**This citation is false.** When undersigned counsel attempted to access www.howmanyofme.com on November 13, 2025, the website was completely non-operational. See Exhibit B (screenshot showing website inaccessible). Research indicates this website has been defunct for over a year, with multiple online sources confirming it is no longer functional.

**Unable to verify LCG's source, undersigned counsel consulted alternative public records databases:**

- **BeenVerified.com** reports **60 individuals** named "Thomas Richards" in the United States

- **Intelius.com** reports **43 individuals** named "Thomas Richards" in the United States

- **Average of both sources: 52 individuals**

See Exhibit B (screenshots from BeenVerified and Intelius searches conducted November 13, 2025).

**LCG's claimed figure of 33,487 is 644 times larger than the actual number** (using the 52-person average). Even if one accepts the higher BeenVerified figure of 60 people, LCG's number is still inflated by 558 times -- a 55,800% fabrication.

**This is not a minor error.** LCG either: (a) Cited a website without verifying it exists or contains the claimed data, or

(b) Fabricated the statistic entirely and cited a defunct website hoping no one would check

Either scenario demonstrates a reckless disregard for accuracy in representations to this Court.

**The dramatic difference between 52 people and 33,487 is dispositive.** LCG's entire argument depends on making "Thomas Richards" seem so common that identification is impossible. With only approximately 50 people sharing this name nationwide -- and Plaintiff being the only one with a documented connection to tax fraud -- LCG's implausibility argument collapses entirely.

**Third, Dan Irish's declaration strategically omits the central question.** Dan Irish's 32-paragraph declaration never states:

- "LCG does not license the Telltale trademark to Skybound"

- "LCG receives no revenue from Skybound"

- "LCG receives no compensation for Skybound's use of the Telltale trademark"

Dan Irish carefully describes what LCG didn't do (develop, publish, distribute) while avoiding whether LCG licenses its trademark and profits from that licensing.

**When a party:**

- Makes contradictory statements (2019 website vs. 2025 motion)

- Cites a non-existent website and fabricates statistics by 55,800%

- Files documents under seal that Plaintiff cannot verify

- Has its CFO carefully avoid the central question about trademark licensing

- Purports to incorporate arguments from other defendants' briefs that had not yet been filed when LCG submitted its motion

**...this Court cannot accept that party's factual assertions without independent corroboration through discovery.**

### 4. Industry Practice Supports Trademark Licensing Inference

The inference that LCG licenses its trademark to Skybound is supported by standard industry practice and basic business logic:

**Trademark owners do not license valuable marks for free.** Trademark licensing agreements typically require the licensee to pay royalties to the licensor, usually calculated as a percentage of sales revenue.[5] Industry standards for trademark royalty rates generally range from 5% to 15% of revenue, with entertainment and fashion licenses often commanding rates in this range.[6] Walking Dead games have generated over $300 million in revenue.[7] No rational trademark owner would permit another company to use its trademark on such a lucrative product without compensation through a licensing agreement providing for royalty payments, minimum guarantees, and quality control provisions."

**The "used with permission" language implies active licensing.** If Skybound were using an orphaned trademark without permission, products would not display "used with permission" -- they would either display no notice or risk infringement claims.

**Skybound's equity investment creates financial interdependence.** In February 2023, Skybound became an equity investor in LCG through an $8 million Series A funding round.[8] Skybound's CEO

---

[5] *Trademark Royalties*, ROYALTYRANGE (Jan. 22, 2025), https://www.royaltyrange.com/resources/trademark-royalties/.
[6] *Trademark Licensing Royalty Rates: How to Set and Negotiate Fair Terms*, PATENTPC (May 12, 2025), https://patentpc.com/blog/trademark-licensing-royalty-rates-how-to-set-and-negotiate-fair-terms; *Royalties & Logo Licensing Fees: Trademark License Agreement Royalty*, TRADEMARKFACTORY (Aug. 20, 2025), https://trademarkfactory.com/blog/royalties-and-payment-structures-in-trademark-licensing/.
[7] *The Walking Dead (Video Game Series)*, WIKIPEDIA, https://en.wikipedia.org/wiki/The_Walking_Dead_(video_game_series) (last visited Nov. 13, 2025).
[8] *Telltale Closes Series A Funding Round Led by Hiro Capital With Co-invest From Skybound*, BUS. WIRE (Feb. 16, 2023), https://www.businesswire.com/news/home/20230216005488/en/.

explicitly connected this investment to Walking Dead: "Telltale and Skybound have a long and incredibly successful history together... hundreds of millions of dollars... since Telltale released the acclaimed first title in The Walking Dead series."[9]

## 5. This Proves Plaintiff's Claims Are Not Frivolous

LCG requests attorney's fees, arguing Plaintiff's suit is baseless. Mem. at 14. But **LCG's own website lists Walking Dead as one of Telltale's "best-selling game series" for which "Telltale won numerous accolades."**

When the defendant's own corporate website claims an association with the very product at issue, Plaintiff's decision to name that defendant is reasonable -- not frivolous. LCG cannot publicly tout its Walking Dead connection to build brand value, then claim Plaintiff acted unreasonably in suing over Walking Dead content.

## 6. Discovery Will Resolve the Question

Plaintiff does not ask this Court to speculate. Plaintiff asks for discovery of:

1. All trademark licensing agreements between LCG and Skybound

2. All royalty or licensing fee payments from Skybound to LCG

3. The unredacted Asset Purchase Agreement

4. Terms of Skybound's equity investment

5. All communications about use of Telltale trademark

Discovery will resolve whether LCG profits from ongoing commercial use of Plaintiff's name through trademark licensing and Skybound investment. If discovery establishes that LCG licenses the Telltale trademark to Skybound and receives compensation—whether through direct licensing fees, revenue

---
[9] *Id.*

sharing, or equity appreciation—LCG is liable under Va. Code § 8.01-40 for ongoing commercial "use" of Plaintiff's name.

But LCG cannot avoid discovery by making contradictory claims, fabricating statistics, and having its CFO carefully avoid the central question.

## B. The Corrected Data Combined with Kirkman's Admitted Pattern Proves Plausibility

With approximately 50 people named Thomas Richards in the United States, Plaintiff's identification claim becomes highly plausible, particularly when examined through the proper framework.

First, Kirkman's admitted targeting pattern establishes the baseline. Kirkman publicly states he names villainous characters after real people he dislikes, stating: "The honest answer is often times I'm writing a script and I'll go through people I remember from like second and third grade" and declaring "I will never name a good character Phillip" because of a real person he disliked. Complaint ¶¶ 41-43. He further noted that he generally avoids using last names (except when he named a character Earl Sutton after a close friend's father). Given this admitted practice, the question is not whether Kirkman named a villain after a real person -- he admits he does this. The question is: which Thomas Richards did he target?

Second, both Kirkman and Plaintiff were major early internet figures during the relevant 2003-2005 period when Kirkman was creating Walking Dead characters. Kirkman was actively promoting Battle Pope and developing Walking Dead online. Plaintiff was one of the most prominent religious voices on the early internet: Plaintiff's first video on Google Video ranked in the top 1% of all videos, (Exhibit C). Plaintiff's content also ranked #2 in YouTube searches for "Vatican" in 2009, (Exhibit C) and Plaintiff operated spirituallysmart.com with substantial daily traffic since 2001 until he began to be horribly censored in 2009.

Third, the specific details create unmistakable identification. The fictional Thomas Richards character falsely claims imprisonment for tax fraud while masking worse crimes. Of the 50 Thomas Richardses in America, how many had any documented connection to someone incarcerated for tax fraud?

The answer: Likely none -- except Plaintiff.

Plaintiff had a publicly known association with Tony Alamo, who was convicted of tax fraud. This association was not hidden -- it was public, online, and searchable during the exact period when Kirkman was creating Walking Dead characters. When Alamo's serious crimes later came to light, Plaintiff immediately and publicly renounced him.

This tax fraud connection is not merely distinctive -- it is almost certainly unique among the 50 people sharing Plaintiff's name. The probability that another Thomas Richards also had a documented, publicly searchable connection to a tax fraud conviction during 2003-2005 is statistically negligible.

Fourth, Kirkman's atheism and documented hostility toward religious figures provides motive. Kirkman's first work, Battle Pope, mocked Jesus. Kirkman has stated there is "no God" in Walking Dead. An atheist creator[10] who ridicules Jesus encountering Plaintiff's prominent biblical content would likely view Plaintiff with hostility -- exactly the kind of animosity Kirkman admits drives his naming choices.

## C. Kirkman's Conspicuous Silence -- And LCG's Improper Attempt to Hide Behind It

LCG's motion attempts to incorporate "other Defendants' arguments" by vague reference. Mem. at 13. LCG asks this Court to accept Kirkman's motion to dismiss as if it somehow exonerates LCG. But even if that were supported by precedent (which it is not) LCG cannot hide behind Kirkman's motion, because

---

[10] Liam McGuire, *Walking Dead's Creator Confirms Whether God Exists in Its Universe*, SCREEN RANT (Dec. 1, 2022), https://screenrant.com/walking-dead-does-god-exist-robert-kirkman-confirms/.

Kirkman's motion contains a deafening silence: nowhere in Kirkman's brief does he deny that he named the character after Plaintiff.

Yet when Plaintiff files a detailed complaint alleging that Kirkman named the Thomas Richards character after him, with specific identifying characteristics (the tax fraud connection) and documented evidence of Plaintiff's substantial early internet presence that Kirkman likely encountered, Kirkman's motion to dismiss is silent on the key question: Did you name this character after Plaintiff? Kirkman includes no declaration stating:

- "I have never heard of Thomas Richards the religious commentator"

- "I did not base this character on any real person"

- "I chose the name 'Thomas Richards' randomly"

- "The tax fraud detail was coincidental"

- "I was unaware of any Thomas Richards associated with Tony Alamo"

These are simple factual statements that would take one paragraph to make. If they were true, Kirkman would make them. His failure to do so -- in the face of specific allegations about his documented pattern of naming villains after real people -- supports the inference that he cannot truthfully make these denials.

LCG asks this Court to dismiss Plaintiff's case based on Kirkman's arguments, whatever they may be. But Kirkman never argues "I didn't do it." He argues only legal theories about why it doesn't matter even if he did. That failure to deny is itself evidence supporting Plaintiff's plausibility showing under Twombly/Iqbal.


**D. LCG's Corporate Shell Game**

Having destroyed its own credibility with fabricated statistics and unable to rely on Kirkman's denials (which don't exist), LCG falls back on corporate technicalities: "We didn't exist in 2012" and "the Asset Purchase Agreement excluded Walking Dead games."

This fails for three reasons:

**First, LCG fails the 12(b)(6) standard.** By conceding all factual allegations about the defamatory content, LCG admits Plaintiff stated valid claims. Corporate structure arguments are affirmative defenses requiring discovery, not grounds for dismissal on the pleadings.

**Second, Virginia law prohibits ongoing "use" of a person's name for commercial purposes, not just original creation.** Va. Code § 8.01-40. LCG admits it owns and licenses the "Telltale" trademark appearing on Walking Dead products with the notice: "Telltale is a trademark of Telltale, Inc., used with permission." The Telltale games website displays a 2024 LCG copyright: "Copyright © 2024 LCG Entertainment, Inc. All Rights Reserved."[11] LCG cannot profit from licensing its trademark for products featuring Plaintiff's name while claiming "we didn't exist in 2012." The statute prohibits ongoing use, regardless of who created the content originally.

**Third, LCG's arguments present factual disputes that cannot be resolved on a motion to dismiss.** LCG claims the Asset Purchase Agreement "excluded" Walking Dead games, but:

- The Agreement is filed under seal -- Plaintiff has never seen it

- LCG's website contradicts this claim (as shown in Section I.A.1), stating LCG will "operate and market games under the Telltale brand" and highlighting Walking Dead

- Even if game source code was excluded, trademark rights were not -- LCG admits owning the Telltale trademark used on all Walking Dead products

---

[11] *Games*, TELLTALE, https://telltale.com/category/games/ (last visited Nov. 13, 2025).

- Skybound's February 2023 equity investment in LCG creates financial benefit regardless of what was excluded in 2019

- LCG's ongoing trademark licensing creates a current commercial relationship with Walking Dead products

Courts cannot resolve these factual questions on a motion to dismiss. LCG asks the Court to credit its version (no involvement) over Plaintiff's (profits through trademark licensing and equity). That's not the 12(b)(6) standard. At this stage, courts accept Plaintiff's allegations as true.

The Court should deny the motion because LCG has not shown Plaintiff can prove no facts entitling him to relief. To the contrary, LCG admits all factual predicates for Plaintiff's claims -- defamatory content exists, uses Plaintiff's name, continues to be sold, causes harm. LCG argues only that corporate structure should immunize it. That requires discovery, not dismissal.

## II. THRESHOLD PROCEDURAL ISSUE: IF THE COURT CONSIDERS LCG'S EXTRINSIC DOCUMENTS, THE MOTION MUST BE CONVERTED TO SUMMARY JUDGMENT AND PLAINTIFF IS ENTITLED TO RULE 56(d) DISCOVERY

**Before reaching the merits, the Court must address a threshold procedural issue: LCG's motion improperly relies on extrinsic documents not incorporated in Plaintiff's Complaint, including an Asset Purchase Agreement that LCG seeks to submit under seal for ex parte review.**

**Under Federal Rule of Civil Procedure 12(d), when "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56," and "all parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."** Fed. R. Civ. P. 12(d).

**LCG has presented multiple extrinsic documents:**

- The Asset Purchase Agreement (to be filed under seal)

- LCG's Certificate of Good Standing (Ex. 1)

- Declaration of Dan Irish (Ex. 2)

**None of these documents are incorporated by reference in Plaintiff's Complaint.** The Complaint references LCG's acquisition (¶ 16) but does not quote from, rely on, or attach the APA. Under Fourth Circuit precedent, **mere reference to a document's existence does not incorporate it.** *Philips v. Pitt Cnty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (document must be "integral to and explicitly relied on in the complaint" to be considered without conversion).

**If the Court considers these extrinsic materials, Plaintiff is entitled to conduct discovery under Rule 56(d) before responding**. Fed. R. Civ. P. 56(d) provides: "If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may... allow time to obtain affidavits or declarations or to take discovery." The Fourth Circuit has held that Rule 56(d) relief is appropriate when "the nonmoving party has not had the opportunity to discover information that is essential to his opposition." *Harrods Ltd. v. Sixty Internet Domain Names,* 302 F.3d 214, 244 (4th Cir. 2002).

**Plaintiff requires discovery on:**

1. **The complete Asset Purchase Agreement**, including all schedules, exhibits, and amendments - not just cherry-picked excerpts submitted under seal by LCG

2. **All subsequent agreements** between LCG and Skybound, including:

   o The 2023 equity investment agreement referenced in press releases

   o Any trademark licensing agreements

   o Any revenue-sharing arrangements

   o Any agreements modifying the original APA terms

3. **Financial records** showing:

   o   Revenue LCG derives from Telltale trademark licensing

   o   Payments received from Skybound

   o   The value of Skybound's equity stake

   o   LCG's role in authorizing Walking Dead products bearing its trademark

4. **Documents showing LCG's control** over the Telltale trademark and its use on Walking Dead products

5. **Communications** between LCG and Skybound regarding Walking Dead products, trademark usage, and distribution

**Plaintiff cannot respond to LCG's factual assertions about the APA without access to the actual document and related discovery.** LCG claims the APA "specifically excluded" Walking Dead games (Mem. at 4), but Plaintiff has no means to verify this claim, examine what rights were actually transferred, or identify subsequent modifications to the arrangement. LCG's CFO Declaration makes sweeping factual assertions (Irish Decl. ¶¶ 1-32), but Plaintiff has had no opportunity to test these assertions through discovery or cross-examination.

**The Court has two options:**

**Option 1: Exclude the extrinsic evidence** and decide the motion under Rule 12(b)(6) standards, accepting Plaintiff's allegations as true.

**Option 2: Convert to summary judgment** under Rule 12(d) and permit Plaintiff at least 60 days to conduct the discovery outlined above before requiring a response.

**What the Court cannot do is consider LCG's extrinsic evidence while denying Plaintiff the discovery to which he is entitled under Rules 12(d) and 56(d).** The procedural protections of these rules are not optional.

**This threshold issue is addressed in detail in Section VI.D.2 below.**

## III. PRELIMINARY STATEMENT: LCG'S IMPROPER REQUESTS

### A. LCG's Request for Attorneys' Fees Is Without Merit

LCG requests this Court "order Plaintiff to reimburse LCG's attorneys' fees, costs and expenses incurred in this action." Mem. at 14. This request is baseless and appears designed solely to intimidate.

Under the American Rule, each party bears its own costs unless:

(1) A statute authorizes fee-shifting, OR

(2) A contract provides for it, OR

(3) The case is frivolous/brought in bad faith

**None apply here:**

**No Statute**: Va. Code § 8.01-40 does not authorize fee awards to prevailing defendants. Neither does Virginia defamation law. LCG cites no statute permitting fee-shifting.

**No Contract**: Plaintiff and LCG have no contractual relationship.

**Not Frivolous:** Plaintiff's suit is well-pleaded with:

- Detailed factual allegations about a character using Plaintiff's exact name for an evil character

- A distinctive identifying connection (tax fraud) beyond mere name coincidence

- Citations to applicable law (Va. Code § 8.01-40, *Armstrong* republication doctrine)

- Allegations of ongoing harm with specific examples (Google Alerts, search contamination)

- Claims against a defendant with admitted commercial relationships to the content

LCG's own motion *admits* the character exists, the games are sold, and LCG operates as "Telltale Games." LCG concedes all factual allegations and argues only corporate structure technicalities. A case raising legitimate questions of successor liability and trademark licensing is not frivolous merely because a defendant disagrees with Plaintiff's legal theories.

Even if LCG prevails on this motion, that would not make Plaintiff's case frivolous -- it would mean the Court agreed with LCG's interpretation of corporate structure defenses, not that the lawsuit was baseless.

**LCG's fee request should be denied.**


### B. LCG Improperly Incorporates "Other Defendants' Arguments" By Reference

LCG states: "For the reasons further argued by other Defendants which are incorporated herein by reference, Plaintiff's claims are implausible, factually deficient, and legally insufficient." Mem. at 13.

This incorporation fails for a fundamental reason: **LCG purports to incorporate arguments from a brief that did not exist when LCG filed its motion.** LCG filed its memorandum at approximately 4pm on October 31, 2025. The defendant whose arguments LCG claims to incorporate -- Kirkman, Scopely, and Skybound -- filed approximately an hour and thirty minutes later. LCG cannot meaningfully adopt arguments it never reviewed because those arguments had not yet been written. One cannot incorporate

what does not exist. At the moment LCG's counsel clicked "file" on its brief, the arguments it purported

to incorporate had not been drafted, reviewed, or filed. LCG's incorporation is literally impossible.

Federal courts uniformly hold that parties must present their own arguments rather than shift that burden

to the court. The Eleventh Circuit explained that accepting incorporation by reference "would place the

onus on the district court to distill any possible argument which could be made based on the materials

before the court. **Presenting such arguments in opposition to a motion for summary judgment is the**

**responsibility of the non-moving party, not the court.**" *Blue Cross & Blue Shield of Ala. v. Weitz*, 913

F.2d 1544, 1550 (11th Cir. 1990). The Federal Circuit adopted this principle, emphasizing that "there is

no onus on the district court to distill any possible argument which could be made based on the materials

before the court." *Pandrol USA, LP v. Airboss Ry. Prods.*, 320 F.3d 1354, 1366-67 (Fed. Cir. 2003). The

Ninth Circuit similarly prohibits incorporating briefs from other cases. 9th Cir. R. 28-1(b).

Virginia courts are equally clear: "**Attempts to incorporate arguments by reference are rejected and**

**will not be recognized by the Court.**" *Winston v. Commonwealth*, 268 Va. 564, 622 (2004) (citing

numerous prior cases establishing this rule). Virginia's prohibition extends to arguments "made in

another court or in another case," id., and applies with even greater force when -- as here -- a party

purports to incorporate arguments that had not yet been filed.

**LCG's temporal impossibility makes its incorporation a nullity.** In *Blue Cross*, the defendant at least

had filed materials in the record from which arguments could theoretically have been constructed; the

court still held the defendant could not rely on the court to "distill" those arguments. 913 F.2d at 1550.

Here, LCG did not even have materials to reference -- it purports to incorporate a document that would

not exist for another hour. If a party cannot rely on a court to construct arguments from materials it

actually filed, it certainly cannot rely on a court to construct arguments from a brief filed later by

someone else.

**LCG's lack of specificity independently defeats its incorporation.** Even if the temporal problem did

not exist, LCG provides no identification of which arguments, from which pages, or addressing which

issues it purports to incorporate. **This forces Plaintiff to guess which of dozens of pages from multiple defendants' motions LCG adopts.** Does LCG incorporate Kirkman's First Amendment arguments? His fair use defenses? His statute of limitations arguments? His personal jurisdiction claims? His challenges to specific allegations? Without specific identification, Plaintiff cannot respond to unidentified arguments, and this Court cannot determine what LCG actually contends.

**LCG's incorporation represents procedural gamesmanship, not legitimate briefing.** LCG's blanket incorporation is not an adoption of specific arguments but a blank check asking this Court to search through subsequently-filed briefs and construct arguments on LCG's behalf -- precisely what Blue Cross, Pandrol, and Winston prohibit. The practice also creates an impossible situation: if this Court were to "ascertain" which arguments LCG supposedly adopts and rule on them, LCG could then argue on appeal that the Court addressed arguments LCG never actually made.

This Court should decline LCG's invitation to do its legal work and should disregard the purported incorporation by reference entirely. LCG has presented no arguments beyond those it actually articulated in its own brief.

Moreover, most of the "other Defendants' arguments" are irrelevant to LCG's motion. Arguments about whether Kirkman intended to target Plaintiff or whether the character is "of and concerning" Plaintiff are irrelevant to LCG's corporate structure defense. LCG's motion argues only that LCG should not be liable due to when it was formed and what it purchased -- not whether the underlying defamation occurred.

**Most significantly, LCG cannot hide behind Kirkman's motion because Kirkman never denies that he named the character after Plaintiff**. Despite Kirkman's public admissions that he intentionally names villainous characters after real people he dislikes, Kirkman's motion contains no declaration stating: "I have never heard of Thomas Richards the religious commentator," "I did not base this character on any real person," or "the tax fraud detail was coincidental." A creator who openly discusses naming villains after people he dislikes, when specifically accused of targeting a particular individual, would be expected to deny the accusation if false. His silence supports Plaintiff's plausibility showing.

## IV. STATEMENT OF FACTS

### A. What LCG Admits By Omission

LCG's 14-page memorandum and Dan Irish's 4-page declaration never dispute these core allegations:

### 1. The Character Exists and Is Defamatory

LCG does not deny The Walking Dead games feature "Thomas Richards" who:

- Is a psychopathic serial killer who murdered his wife

- Was caught "red-handed cutting up his wife's body"

- Falsely claims imprisonment for tax fraud to hide violent crimes

- The game shows him "turning his head away" when making the false tax fraud claim

See Complaint ¶¶ 53-56, 85-86. **LCG's motion challenges none of these facts.**

### 2. The "Of and Concerning" Connection

LCG does not deny:

- Plaintiff's name is Thomas Richards

- Plaintiff operates spirituallysmart.com using his real name

- Plaintiff previously supported Tony Alamo, convicted of tax fraud

- The character's false tax fraud claim mirrors Plaintiff's association with a tax fraud convict

- This creates a distinctive identifying connection

- Kirkman admitted naming villains after real people he dislikes

See Complaint ¶¶ 40-52, 56, 65-73. **LCG is silent on all of this.**

## 3. Ongoing Commercial Exploitation

LCG does not deny:

- Walking Dead games sold on Steam, PlayStation, Xbox, Epic, GOG

- Definitive Series released September 10, 2019 (after LCG formed/acquired assets)

- $300+ million revenue, 80 million episodes sold

- Sales continuing through 2024-2025 with recent 90% off promotions

- Every copy displays: "Telltale is a trademark of Telltale, Inc., used with permission"

**LCG does not dispute any of this ongoing activity.**

## 4. Harm to Plaintiff

LCG does not deny:

- Plaintiff receives Google Alerts associating his name with a murderer

- Search results return both Plaintiff's ministry and a serial killer description

- This damages Plaintiff's religious outreach

- Plaintiff suffers mental anguish

See Complaint ¶¶ 74-81. **LCG never addresses these harm allegations.**

**On a Rule 12(b)(6) motion, the Court must accept Plaintiff's well-pleaded factual allegations as true and construe them in the light most favorable to Plaintiff.** Ramizi v. Blinken, 745 F. Supp. 3d 244, 256 (E.D.N.C. 2024); Bragg v. Bd. of Supervisors, 295 Va. 416, 420 (2018). **LCG's motion "tests the legal sufficiency of the complaint; it does not resolve contests surrounding the facts."** Ramizi, 745 F. Supp. 3d at 256. **By failing to challenge these factual allegations, LCG has left them uncontested, and the Court must accept them as true for purposes of this motion.**

## 5. LCG's Certificate of Good Standing Is Irrelevant

LCG attaches its Delaware Certificate of Good Standing (Exhibit 1) showing formation on December 27, 2018, six years after the 2012 Walking Dead game. Mem. at 3. Plaintiff does not dispute this timeline.

**But this proves nothing**. Plaintiff's claims are based on ongoing use (2019-2025), not 2012 creation. The Certificate is irrelevant to whether LCG currently profits from trademark licensing and Skybound equity -- relationships that post-date LCG's formation. A defendant's formation date does not immunize it from liability for ongoing statutory violations occurring entirely within its corporate existence.

## D. LCG's Relationship with The Walking Dead

Despite claiming "done nothing with respect to The Walking Dead" (Irish Decl. ¶ 20), upon information and belief, LCG has a complex, profitable, ongoing commercial relationship with Walking Dead products operating through: (1) trademark ownership/licensing; (2) Skybound's equity investment; (3) brand exploitation.

## 1. LCG Owns and Operates as "Telltale Games" – multiple sources confirm this.

- LCG admits it "continues to do business as Telltale Games." Mem. at 2; Compl. ¶ 17.

- LCG's official website: "As of 2019, the Telltale brand, assets, and various IP are now owned by LCG Entertainment, operating, and marketing games under the Telltale name."

- LCG Entertainment acquired several key Telltale assets and on August 28, 2019, announced it was re-launching the company by assuming 'Telltale Games' as its trade name.[12]

- Holdings company LCG Entertainment, which will do business as Telltale Games, said it has acquired the defunct studio's key assets, trademarks, technology.[13]

- LCG Entertainment announced it has purchased the assets, trademarks, technology, and select intellectual properties of Telltale Games, and will operate as Telltale Games."[14]

**Why this matters:** LCG didn't just buy assets -- it acquired and actively uses the entire Telltale brand identity. This is not passive ownership; it's active commercial exploitation.

2. **The "Telltale" Brand Was Built By Walking Dead**

The original Telltale Games had become an established studio in producing episodic adventure games. While its earlier titles were modest successes, the studio had become successful with its release of the licensed property The Walking Dead in 2012. The Walking Dead helped Telltale establish major licenses from other franchises.[15]

---

[12] Telltale Games (2018–present), WIKIPEDIA, https://en.wikipedia.org/wiki/Telltale_Games_(2018–present) (last visited Nov. 13, 2025).

[13] Tom Ivan, Telltale Games brand to relaunch under new ownership, VIDEO GAME CHRON. (Aug. 28, 2019), https://www.videogameschronicle.com/news/telltale-games-brand-to-relaunch-under-new-ownership/.

[14] Sal Romano, LCG Entertainment revives Telltale Games, GEMATSU (Aug. 28, 2019, 8:57 AM), https://www.gematsu.com/2019/08/lcg-entertainment-revives-telltale-games.

[15] "The original Telltale Games had become an established studio in producing episodic adventure games. While its earlier titles were modest successes, the studio had become successful with its release of the licensed property The Walking Dead in 2012. The Walking Dead helped Telltale establish major licenses from other franchises."

Skybound's investor materials highlight the revenue generated by Telltale's Walking Dead games: "$333M from Telltale's The Walking Dead game; 80M units sold."[16] When consumers hear "Telltale Games," they associate it with The Walking Dead. That brand association -- and the goodwill it represents -- is exactly what LCG acquired and now monetizes through ongoing sales.

## 3. What LCG Actually Acquired

LCG Entertainment, a holdings company based out of Los Angeles, has announced it has purchased the assets, trademarks, technology, and select IPs from Telltale Games.[17]

Note the repeated emphasis on **"trademarks"** -- exactly what appears on Walking Dead products.

LCG's motion focuses narrowly on game source code while obscuring what it actually acquired: the valuable Telltale brand and trademark rights used on Walking Dead products.

## E. The "Telltale" Trademark and Ongoing Commercial Exploitation

**The Copyright Notice: "Used with Permission"**

Every digital storefront displaying The Walking Dead: The Telltale Definitive Series includes an identical copyright notice:

"© 2018-2019 Skybound, LLC and/or its affiliates. Based on the Comic book by Robert Kirkman, Tony Moore and Charlie Adlard. The Walking Dead is a trademark of Robert Kirkman, LLC, used with

---

[16] Skybound's investor materials emphasize the money made by : "$333M from Telltale's The Walking Dead game; 80M units sold

[17] Peter Glagowski, LCG Entertainment acquires Telltale Games, will revive select games, DESTRUCTOID (Aug. 28, 2019, 12:45 PM), https://www.destructoid.com/lcg-entertainment-acquires-telltale-games-will-revive-select-games/.

permission. The Skybound mark and any related logos are trademarks of Skybound, LLC. **Telltale is a trademark of Telltale, Inc., used with permission**. All rights reserved."

LCG continues to profit from the Telltale brand through ongoing game sales. The Walking Dead: The Telltale Definitive Series -- released in September 2019 and October 2020, after LCG's August 2019 acquisition -- remains actively sold on Steam ($49.99), PlayStation (currently $12.49), Xbox, Epic Games, and other platforms, with the PlayStation listing alone generating over 12,500 customer reviews. The express statement "Telltale is a trademark of Telltale, Inc., used with permission" on every product page confirms LCG's authorization of Skybound's ongoing use of the Telltale brand to market and sell these games commercially.[18]

**What "Used with Permission" Means:**

"Used with permission" is trademark licensing language meaning:

- Skybound does not own the "Telltale" trademark

- Skybound is using someone else's trademark

- That someone (Telltale, Inc./LCG) has given permission

- Permission to use valuable trademarks typically requires compensation

LCG owns Telltale, Inc. and the Telltale trademark, as confirmed by U.S. Patent and Trademark Office records[19] and LCG's own website.[20]

---

[18] The Walking Dead: The Telltale Definitive Series, STEAM, https://store.steampowered.com/app/1449690/The_Walking_Dead_The_Telltale_Definitive_Series/ (last visited Nov. 13, 2025); The Walking Dead: The Telltale Definitive Series, PLAYSTATION, https://www.playstation.com/en-us/games/the-walking-dead-the-telltale-definitive-series/ (last visited Nov. 13, 2025); The Walking Dead: The Telltale Definitive Series, NUUVEM, https://www.nuuvem.com/ca-en/item/the-walking-dead-the-telltale-definitive-series (last visited Nov. 13, 2025).
[19] U.S. Trademark Registration No. 4,349,236 (registered June 11, 2013; current owner LCG Entertainment, Inc.), available at https://trademarks.justia.com/857/08/telltale-85708454.html (last visited Nov. 13, 2025).
[20] About Us, TELLTALE, https://telltale.com/about-us/ (last visited Nov. 13, 2025) ("As of 2019, the Telltale brand, assets, and various IP are now owned by LCG Entertainment, operating, and marketing games under the Telltale name.").

**If Skybound is using LCG's trademark "with permission" to sell games from a franchise that generated $333M in revenue and 80M units sold, basic business logic dictates LCG receives compensation. Trademark owners do not license valuable marks for free on commercially successful products.[21]**

**Dan Irish's Declaration Is Silent on Trademark Licensing**

The declaration states LCG "has done nothing with respect to The Walking Dead" (¶ 20) but **never says**:

- "LCG does not own the Telltale trademark"

- "LCG does not license the Telltale trademark to Skybound"

- "LCG receives no revenue from Skybound's trademark use"

- "LCG receives no compensation for 'permission' to use Telltale on Walking Dead products"

These omissions are telling. If LCG truly "has done nothing," why not simply state: "LCG receives no money from Walking Dead"?

**F. Skybound's Investment in LCG**

**The February 2023 Investment**

In February 2023, Skybound became an equity investor in LCG through $8 million Series A funding:

- "Telltale announced today that the company has secured a Series A round of funding led by Hiro Capital and joined by Skybound Entertainment."[22]

- In February 2023, Telltale raised $8 million in funding from Hiro Capital and Skybound Entertainment.[23]

---

[21] Video Games, SKYBOUND ENT., https://invest.skyboud.com/ (last visited Nov. 13, 2025).

[22] *Telltale Closes Series A Funding Round Led by Hiro Capital With Co-invest From Skybound*, BUS. WIRE (Feb. 16, 2023), https://www.businesswire.com/news/home/20230216005488/en/.

[23] Telltale Games (2018–present), WIKIPEDIA, https://en.wikipedia.org/wiki/Telltale_Games_(2018–present) (last visited Nov. 13, 2025).

- O&A, P.C., client Telltale Games has completed its first round of preferred equity financing, with Hiro Capital LLP and Skybound Entertainment LLC leading the Series A."[24]

**Skybound's CEO Connected Investment to Walking Dead:**

David Alpert, CEO, Skybound Entertainment stated "Telltale and Skybound have a long and incredibly successful history together that forever changed the way stories are told in video games. It has been just over 10 years, hundreds of millions of dollars, and over 100 Game of the Year awards since Telltale released the acclaimed first title in The Walking Dead series."[25]

What This Creates:

A circular financial relationship:

- Skybound sells Walking Dead games → generates revenue

- Skybound uses LCG's Telltale trademark → likely pays licensing fees

- Skybound's profits increase → Skybound's company value rises

- Skybound owns LCG equity → LCG benefits from Skybound's increased value

**Dan Irish Never Mentions Skybound's Equity Investment**

Dan Irish's 32-paragraph declaration is silent on:

- Skybound owning equity in LCG

- Skybound's investment being tied to Walking Dead success

---

[24] O&A client Telltale Games completes first preferred equity financing, O&A, P.C. (Mar. 8, 2023), https://oandapc.com/oa-client-telltale-games-completes-first-preferred-equity-financing/.

[25] *Telltale Closes Series A Funding Round Led by Hiro Capital With Co-invest From Skybound*, BUS. WIRE (Feb. 16, 2023), https://www.businesswire.com/news/home/20230216005488/en/.

- LCG benefiting financially when Walking Dead sells

These omissions are fatal to LCG's "nothing to do with Walking Dead" narrative.

## G. Current Sales Through 2024-2025

**Current Availability:**

- Steam

- PlayStation Store

- Xbox

- Epic Games Store

- GOG

- 25+ third-party resellers[26]

**Recent Sales Activity Includes**:

- October 2024: "Steam's The Walking Dead Franchise Sale ends on November 4, 2024."[27]

- November 2025: "You can get every single one of Telltale's The Walking Dead seasons for $5...
  The deal ends on Steam November 3."[28]

---

[26] The Walking Dead: The Telltale Definitive Series PC, GG.DEALS, https://gg.deals/game/the-walking-dead-the-telltale-definitive-series/ (last visited Nov. 13, 2025).

[27] Natalia Koczorowska, The Walking Dead Franchise Sale on Steam: get TWD Season 1 at 90% off & more, GG.DEALS (Oct. 28, 2024), https://gg.deals/deal/the-walking-dead-franchise-sale-on-steam-get-twd-season-1-at-90-off-more/.

[28] Harvey Randall, You can get every single one of Telltale's The Walking Dead seasons for $5—which is around $1 per 10 hours of game, PC GAMER (Oct. 28, 2025), https://www.pcgamer.com/games/adventure/you-can-get-every-single-one-of-telltales-the-walking-dead-seasons-for-usd5-which-is-around-usd1-per-10-hours-of-game/.

- May 2025: "The Walking Dead: The Telltale Definitive Series is available for PC via Steam with this incredible 90% off discount."[29]

**Revenue:**

- As of January 2025, The Walking Dead: The Telltale Definitive Series sold 80 million episodes and generated over $300 million in revenue.[30]

These are not historical 2012 sales. These are sales occurring **while**:

- LCG owns the Telltale trademark

- Skybound uses that trademark "with permission"

- Skybound holds equity in LCG

- Products feature "Thomas Richards" without authorization

**H. What Dan Irish Carefully Avoids Saying**

**What He Actually Says:**

- "LCG has had no role in development, publishing or distribution of Walking Dead games" (¶ 8)

- "LCG never purchased Walking Dead games" (¶ 19)

- "LCG has done nothing with respect to The Walking Dead" (¶ 20)

**What He Never Says:**

---

[29] Amanda Kay Oaks, The Best Walking Dead Games Are 90% Off Right Now, COMICBOOK.COM (Mar. 15, 2025, 2:16 PM), https://comicbook.com/gaming/news/the-walking-dead-games-on-sale/.

[30] *The Walking Dead (Video Game Series)*, WIKIPEDIA, https://en.wikipedia.org/wiki/The_Walking_Dead_(video_game_series) (last visited Nov. 13, 2025).

- "LCG does not own the Telltale trademark"

- "LCG does not license the trademark to Skybound"

- "LCG receives no trademark licensing revenue"

- "Skybound does not own LCG equity"

- "LCG has no financial interest in Walking Dead sales"

- "LCG does not benefit when Walking Dead games sell"

- "The Telltale brand has no Walking Dead association"

- "LCG does not market itself as 'Telltale Games' to capitalize on Walking Dead"

**The "Development, Publishing, Distribution" Evasion:**

Saying LCG has no role in "development, publishing or distribution" sidesteps the actual issue. LCG doesn't need to develop games (write code), publish them (act as publisher), or distribute them (host downloads) to have a commercial relationship.

**Analogy:** Nike licenses its swoosh to third-party manufacturers. Nike doesn't "develop, manufacture, or distribute" those products, but Nike absolutely has a commercial relationship and receives royalties.

Same here. LCG may not develop/publish/distribute games, but it licenses its trademark for use on them.

**The Declaration Proves Plaintiff's Point:**

By narrowly focusing on "we didn't develop/publish/distribute" while remaining silent on trademark licensing, royalties, and Skybound equity, Dan Irish admits through omission that LCG is playing a corporate shell game -- profiting through trademark/equity while claiming "nothing to do with Walking Dead" when sued.

## V. LEGAL STANDARD

**Rule 12(b)(6):** "The court accepts the complaint's factual allegations as true, and construes them in the light most favorable to the plaintiff." Ramizi v. Blinken, 745 F. Supp. 3d 244, 256 (E.D.N.C. 2024) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.

**Courts must:**

- Accept all well-pleaded factual allegations as true

- Construe facts in the light most favorable to plaintiff

- Dismiss only if the complaint fails to state a plausible claim for relief

- Note that legal conclusions are not entitled to the presumption of truth

*Ramizi*, 745 F. Supp. 3d at 256 (citing *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

When a court does not conduct an evidentiary hearing on personal jurisdiction, a case may be dismissed for lack of personal jurisdiction if the plaintiff has failed to make a prima facie showing. *Medmarc Cas. Ins. Co. v. GD Grp. USA Co.*, 669 F. Supp. 3d 555, 560 (E.D. Va. 2023). The court must "view all relevant allegations in the light most favorable to the plaintiff and draw all reasonable inferences for the existence of jurisdiction." *Johnson v. Ebenezer Baptist Church*, 2013 WL 12097815, at *2 (E.D. Va. 2013). Only well-pleaded factual allegations must be accepted as true. *Mullinex v. John Crane Inc.*, 606 F. Supp. 3d 289, 292-93 (E.D. Va. 2022).

## VI. ARGUMENT

**A. LCG Has Failed Its Burden Under Rule 12(b)(6)**

**1. LCG Concedes All Material Facts**

To prevail on Va. Code § 8.01-40, Plaintiff must show:

(a) Defendant used plaintiff's name

(b) Without consent

(c) For purposes of trade

(d) Causing injury

LCG concedes (a), (c), and (d):

**a) Use of Name:** LCG does not deny games feature "Thomas Richards." LCG argues only it didn't create the character. But "use" under § 8.01-40 doesn't require creation -- it prohibits ongoing use. *See Town & Country Props. v. Riggins*, 249 Va. 387, 393-97 (1995) (rejecting defendant's argument it didn't create flyer; statute prohibits "use" regardless of creation; defendant liable where it "accepted benefits with full knowledge" by receiving commission from sale promoted by flyer). Products featuring "Thomas Richards" continue to be sold, bearing LCG's trademark notice stating "Telltale is a trademark of Telltale, Inc., used with permission," with LCG's authorization, for LCG's benefit. LCG's continued receipt of revenue from these sales constitutes ongoing "use" under the statute. *Id.* at 397.

**(c) For Trade**: LCG does not deny games are sold commercially. Commercial sale is quintessentially "trade."

**(d) Injury:** LCG never addresses harm allegations (Compl. ¶¶ 74-81). By omission, LCG concedes injury.

**For defamation**: False statement + of and concerning + publication + injury.

**LCG concedes all four**:

**(a) False Statement**: LCG does not deny the character is portrayed as a murderer. LCG does not argue this is somehow true of Plaintiff.

**(b) Of and Concerning**: LCG does not address "of and concerning" allegations (¶¶ 56, 65-73). LCG does not challenge the name match, the tax fraud connection, or Kirkman's admitted pattern of naming villains after real people he dislikes. Silence = concession.

Under *Rush v. Worrell Enterprises*, 21 Va. Cir. 203 (1990), "the test is not whom the story intends to name, but who a part of the audience may reasonably think is named -- not who is meant but who is hit." With only 52 individuals named Thomas Richards in the United States, and Plaintiff being the only one with any documented connection to tax fraud, a reasonable audience member encountering a character named "Thomas Richards" who falsely claims imprisonment for tax fraud would identify Plaintiff. LCG does not challenge this.

Moreover, LCG attempts to incorporate "other Defendants' arguments" but cannot rely on Kirkman's motion because Kirkman never denies naming the character after Plaintiff. Despite his public admissions about intentionally naming villains after real people, Kirkman offers no declaration stating he didn't target Plaintiff. LCG cannot bootstrap its motion onto a non-existent denial.

**(c) Publication**: LCG does not deny games were published widely.

**(d) Injury**: LCG never addresses harm.

**By conceding all factual elements, LCG admits Plaintiff stated valid claims**. Corporate structure arguments go to ultimate liability after discovery, not whether claims are stated.

**2. Corporate Structure Is a Factual Dispute Requiring Discovery**

LCG's entire motion rests on factual assertions:

- "We weren't formed until 2018"

- "We didn't acquire Walking Dead games"

- "Asset Purchase Agreement excluded them"

**These are factual disputes inappropriate for 12(b)(6) resolution requiring discovery into:**

- What did the Asset Purchase Agreement actually include/exclude?

- Did LCG acquire trademark rights separate from game source code?

- What licensing agreements exist between LCG and Skybound?

- What revenue does LCG receive from Skybound's trademark use?

- How does Skybound's equity create financial benefit from Walking Dead sales?

- What role did LCG play in September 2019 Definitive Series release?

Courts cannot resolve factual questions on motions to dismiss. LCG asks the Court to credit its version (no involvement) over Plaintiff's (profits through trademark/equity). That's not the 12(b)(6) standard.

At this stage, courts accept Plaintiff's allegations as true. Plaintiff alleges LCG profits from ongoing use of his name through trademark licensing and Skybound investment. These allegations are plausible, supported by:

- Copyright notice: "Telltale is a trademark of Telltale, Inc., used with permission"

- LCG's admitted Telltale trademark ownership

- LCG's admitted operation as "Telltale Games"

- Skybound's documented $8M equity investment

- Skybound's statements connecting investment to Walking Dead

- LCG website stating it owns "Telltale brand, assets, and various IP"

- Ongoing sales generating $300M+ with LCG's trademark

**Whether LCG can ultimately prove corporate structure shields it is for summary judgment/trial after discovery, not dismissal on pleadings.**

LCG argues it is not a proper defendant because it allegedly did not acquire the Walking Dead games when it purchased assets from Telltale in 2019. Whether LCG's corporate structure and asset purchase agreements shield it from liability is a question for summary judgment or trial after discovery, not dismissal on the pleadings.

Under Virginia law and Fourth Circuit precedent, issues of corporate structure, successor liability, and piercing the corporate veil are quintessentially fact-intensive inquiries inappropriate for resolution at the motion to dismiss stage. Courts have consistently recognized that these determinations demand "close examination of the factual circumstances surrounding the corporation" and cannot be resolved based solely on the allegations in a complaint. *Hengle v. Asner*, 433 F. Supp. 3d 825, 890 (E.D. Va. 2020) (quoting *Greenberg v. Commonwealth ex rel. Att'y Gen. of Va.*, 499 S.E.2d 266, 272 (Va. 1998)).

In *Hengle*, the court explicitly held that "a decision whether to disregard the corporate structure to impose personal liability is a fact-specific determination, requiring close examination of the factual circumstances surrounding the corporation," and therefore declined to resolve corporate liability issues at the pleading stage. 433 F. Supp. 3d at 890. The court emphasized that while defendants argued that "corporate liability principles protect them," such arguments were premature and better suited for later stages of litigation after factual development. Id. at 862-63. This approach reflects the fundamental principle that Rule 12(b)(6) motions "test[] the sufficiency of a complaint" but do "not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Id. at 838 (citing Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992)).

Similarly, in *Khoshaba v. Stilwell*, addressing whether to apply the business judgment rule at the motion to dismiss stage, the court emphasized that fact-intensive defenses are generally inappropriate for consideration at this early stage. 749 F. Supp. 3d 572, 608-09 (E.D. Va. 2024). The court noted that "the majority of federal courts across jurisdictions have cautioned that the business judgment rule is highly fact dependent and, therefore, inappropriate for consideration on a motion to dismiss." Id. at 608-09. The *Khoshaba* court further explained that "reviewing courts have described application of the business judgment rule as 'highly fact intensive,' and recognize that overcoming its presumptions on the merits can be 'a near-Herculean' task," and that "mandating such fact intensive pleading would arguably be in tension with Rule 8" of the Federal Rules of Civil Procedure. Id. at 609. The court held that as "the business judgment rule is often recognized as an affirmative defense, a motion to dismiss generally cannot reach the merits of an affirmative defense unless all facts necessary to the affirmative defense clearly appear on the face of the complaint." Id. at 610. The court further observed that "only in relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint may the court resolve the dispute at the 12(b)(6) stage." Id.

The Fourth Circuit's treatment of successor liability claims further underscores that such issues require factual development beyond the pleading stage. *In Vianix Del., LLC v. Nuance Communs., Inc*., the court allowed successor liability claims to proceed past a motion to dismiss, holding that "the question of whether [defendant] is actually [the predecessor's] successor is a factual issue to be resolved after the parties have had an opportunity to conduct discovery." 637 F. Supp. 2d 356, 360 (E.D. Va. 2009). The court recognized that the plaintiff "may be able to prove a set of facts to demonstrate that [defendant] expressly assumed the [relevant contract] pursuant to the terms of [a] Share Purchase Agreement" and that the plaintiff "may be able to prove that [defendant] impliedly assumed responsibility" through its conduct. Id. at 360-61. Significantly, the court emphasized that although the defendant's pleadings "cast doubt upon [the plaintiff's] allegation[s]," a motion to dismiss "does not resolve the merits of a claim, but tests only the sufficiency of a complaint." Id. at 360 (citing *Republican Party of N.C*., 980 F.2d at 952).

This body of precedent reflects a consistent principle: corporate structure defenses are affirmative defenses that defendants bear the burden of proving, not elements that plaintiffs must negate in their complaint. LCG has not demonstrated that this is one of the "relatively rare circumstances" where "facts sufficient to rule on an affirmative defense are alleged in the complaint." *Khoshaba*, 749 F. Supp. 3d at 610. Plaintiff has adequately alleged all necessary elements of his claims -- defamatory content exists, uses Plaintiff's name, continues to be published and sold, and causes ongoing harm. LCG's defense -- that its corporate structure and asset purchase terms preclude liability -- is precisely the type of affirmative defense requiring factual development that is inappropriate for resolution at the pleading stage.

In conclusion, LCG's motion to dismiss should be denied, and these issues should be reserved for summary judgment or trial after the parties have had a full and fair opportunity to develop the factual record through discovery.

## B. LCG's "We Didn't Create It" Defense Fails as a Matter of Law

### 1. Va. Code § 8.01-40 Prohibits Ongoing "Use," Not Just Creation

Va. Code § 8.01-40 provides: "Any person whose name... is used without written consent... for purposes of trade... shall have a right of action."

The statute prohibits "use" -- present tense, ongoing. Not "create," "originally publish," or "first distribute." It prohibits unauthorized use for trade, regardless of who created the content.

LCG argues it cannot be liable because it "did not even exist in 2012." Mem. at 2. This argument fails on multiple grounds.

**First, Plaintiff's claim is based on LCG's ongoing use (2019-2025), not the 2012 publication.** The Complaint alleges that LCG actively exploits products featuring Plaintiff's name through:

- Release of "The Walking Dead: The Telltale Definitive Series" in 2019 -- a new compilation created and distributed by LCG after it acquired Telltale's assets (Compl. ¶ 101)

- Ongoing digital sales and distribution through 2024-2025 (Compl. ¶ 101)

- Operation under and licensing of the Telltale trademark to third parties (Compl. ¶ 17)

- Continued streaming platform availability (Compl. ¶ 101)

- Revenue generation from products featuring Plaintiff's unauthorized name (Compl. ¶ 104)

LCG cannot escape liability by pointing to its 2018 formation date when the unauthorized use continues under its ownership, control, and authorization, with its trademark prominently displayed, and for its direct financial benefit.

**Second, the statute does not require proving the defendant was the original creator.** It requires only that the defendant "use" Plaintiff's name for trade. In *Pts Corp. v. Buckman*, 263 Va. 613, 619-20 (2002), the Virginia Supreme Court held that liability under § 8.01-40 requires that defendant "use" the plaintiff's name, explaining that the "statutory cause of action is premised upon the concept that a person holds a property interest in his or her name and likeness" and that "[a] conversion occurs when another exercises dominion and control over such intangible personal property and uses it without the owner's consent."

LCG exercises dominion and control over products bearing Plaintiff's name through its ownership of the Telltale trademark, its authority over ongoing distribution, its 2019 release of new compilations, and its licensing arrangements. This constitutes "use" within the plain meaning of § 8.01-40.

In *Berger v. Capitol Color Mail, Inc.,* 38 Va. Cir. 261, 263 (1995), a Virginia court found liability under § 8.01-40 for both a photographer who created and sold a photograph and an advertising company

(Capitol Color) that purchased and used it in advertising flyers. The court held that "the sale of a photograph by a professional photographer is ipso facto within the trade of the photographer" and that Capitol Color's commercial use of the photograph constituted actionable conduct under the statute. This demonstrates that § 8.01-40 liability extends to entities that acquire and commercially exploit unauthorized uses created by others.

**Third, if LCG's interpretation were correct, statutory violations could be immunized through corporate restructuring.** An original wrongdoer could simply transfer assets to a new entity, which would then continue profiting from the unauthorized use while claiming "we didn't create it." This interpretation would gut the statute's protective purpose. The statute protects against unauthorized commercial use -- it does not provide a safe harbor for entities that acquire and continue exploiting such uses.

**Fourth, LCG is not a passive holder of dormant assets but an active commercial exploiter.** LCG released new products (the 2019 Definitive Series), maintains active distribution, licenses its trademark for others' use, and generates ongoing revenue. This active exploitation distinguishes LCG from a hypothetical passive purchaser of archived materials.

At the pleading stage, Plaintiff need only allege that LCG "uses" his name for purposes of trade without consent. Plaintiff has alleged ongoing commercial distribution, active release of new compilations, trademark licensing, revenue generation, and continued platform availability -- all within LCG's control and for LCG's financial benefit. These allegations state a plausible claim under § 8.01-40.

The statute protects against ongoing unauthorized commercial use. LCG cannot escape liability by pointing to its formation date when that use continues under its ownership and authorization.

## 2. Each Continued Distribution Creates Separate Violation

Plaintiff alleged:

"Under Virginia law, each unauthorized use of a name for commercial purposes constitutes a separate violation of Va. Code § 8.01-40. Refer to *Myska v. RMS Techs*., 25 Va. Cir. 344 (1991) (holding 'each of several communications to a third person by the same [publisher] is a separate publication')." Compl. ¶ 102.

"The transformation of Thomas Richards character from comic books to video games to streaming represents distinct communications to different audiences through different channels, not a single mass publication." Compl. ¶ 102.

**LCG does not address *Myska* or challenge the multiple publication theory. By failing to address it, LCG concedes it.**

Under *Myska*, even if LCG had no involvement in 2012 (all LCG argues), **each subsequent sale in 2019-2025 creates a fresh violation.** Ongoing Steam sales, PlayStation downloads, Xbox purchases -- each is a separate communication.

These sales occur:

- While LCG owns Telltale trademark

- With products bearing "Telltale is a trademark of Telltale, Inc., used with permission"

- For LCG's financial benefit (trademark licensing, Skybound equity)

- Without Plaintiff's authorization

This creates continuing violations post-dating LCG's formation, making "we didn't exist in 2012" irrelevant.

Moreover, Walking Dead: Telltale Definitive Series was released September 10, 2019 -- after LCG formed (December 27, 2018) and acquired assets (August 28, 2019). This is not republication of 2012 content -- this is a new product release under LCG's trademark ownership.

**Each separate sale and distribution constitutes a new and distinct cause of action under Va. Code § 8.01-40.** In *Myska v. RMS Techs*., 25 Va. Cir. 344, 345 (1991), the court addressed whether multiple violations of § 8.01-40 by the same defendant gave rise to several individual claims or a single all-encompassing cause of action. The court held that "each of several communications to a third person by the same [publisher] is a separate publication" and thus a separate violation. *Id*. The court emphasized that "the rule is not aimed at the particular tort alleged, but rather at the manner in which the tort is executed." *Id.* Critically, the court rejected applying the single publication rule to bar a misappropriation suit "where no mass communication was used," finding instead that each separate use constituted a distinct actionable violation. *Id.* at 347.

Here, LCG's ongoing commercial exploitation of products featuring Plaintiff's unauthorized name involves multiple distinct distributions across different platforms and time periods:

- The September 2019 release of The Walking Dead: The Telltale Definitive Series as a new compilation

- Ongoing digital sales through Steam, Epic Games Store, GOG, and other platforms from 2019-2024

- Continued physical distribution of the Definitive Series through retail channels

- Streaming availability on platforms including Netflix, Amazon Prime, and Paramount+ through 2025

Under *Myska,* each of these distributions constitutes a separate communication to third parties and thus a separate violation of § 8.01-40. The court in *Myska* specifically distinguished between mass publications (where the single publication rule applies) and separate communications to different parties. *Id*. at 346-47. LCG's distribution across multiple platforms, to different purchasers, over multiple years, falls squarely within the category of "several communications to a third person" that *Myska* held constitute separate publications and separate causes of action.

LCG cannot argue "no involvement" in a product released under its own trademark mere weeks after completing its acquisition. Each sale of the Definitive Series since September 2019 constitutes a separate violation occurring entirely during LCG's corporate existence and under LCG's authorization via trademark licensing. Under *Myska*, these are not mere continuations of a 2012 wrong -- they are new and distinct violations for which LCG bears direct responsibility.

The statute protects against ongoing unauthorized commercial use. LCG cannot escape liability by pointing to its formation date when that use continues under its ownership and authorization.

### C. LCG Cannot Simultaneously Exploit and Disclaim Telltale-Walking Dead Connection

LCG's position is internally contradictory and legally untenable. LCG simultaneously:

**Exploits the Telltale-Walking Dead connection:**

- Operates publicly as "Telltale Games"

- Licenses the Telltale trademark for Walking Dead products

- Profits from the Telltale brand whose value derives substantially from Walking Dead's $300+ million commercial success

- Accepted an $8 million equity investment from Skybound, with Skybound's CEO explicitly tying the investment to Walking Dead's "hundreds of millions of dollars" in revenue and "over 100 Game of the Year awards"

**But disclaims responsibility:**

- "We have done nothing with respect to Walking Dead" (Irish Decl. ¶ 25)

- "We had no role or involvement" (Mem. at 2)

- "We should not be liable" (Mem. at 12-13)

This contradiction is not merely rhetorical - it goes to the heart of LCG's liability under § 8.01-40. Under *Pts Corp. v. Buckman,* liability attaches to those who "use" a plaintiff's name by exercising "dominion and control" over that use. 263 Va. at 619-20. LCG exercises such control through its trademark ownership and licensing arrangements.

LCG cannot claim it exercises no control over Walking Dead products while simultaneously:

- Owning the trademark under which those products are distributed

- Licensing that trademark to Skybound for Walking Dead merchandise

- Collecting revenue from trademark licensing fees

- Holding itself out as "Telltale Games" to capitalize on the brand's Walking Dead-built reputation

Every investor presentation, press release, and business document describes LCG's 2019 acquisition as obtaining "the Telltale brand." That brand means Walking Dead - the franchise generated over $300 million in revenue and won over 100 Game of the Year awards, dwarfing all other Telltale properties combined. When LCG licenses the Telltale trademark to Skybound for Walking Dead products, LCG is directly authorizing commercial exploitation of products featuring Plaintiff's unauthorized name.

**The statute imposes liability based on "use," not creative authorship.** Va. Code § 8.01-40(A). LCG's control over whether and how the Telltale trademark appears on Walking Dead products - products that feature Plaintiff's name without consent - establishes the "use" required for statutory liability under *Buckman*. LCG's attempt to profit from the Telltale-Walking Dead connection while disclaiming any connection sufficient to establish liability is inconsistent with the plain meaning of "use" under the statute.

LCG cannot own "Telltale," operate as "Telltale Games," license "Telltale" for Walking Dead products, accept investment based on Walking Dead's success, and profit from the Telltale brand's Walking Dead-built value - while simultaneously claiming insufficient connection to Walking Dead to establish § 8.01-

40 liability. LCG's commercial exploitation of the Telltale trademark on products featuring Plaintiff's

unauthorized name constitutes "use" within the statutory meaning.

## D. LCG's Reliance on Extrinsic Evidence Requires Either Exclusion of That Evidence or Conversion to Summary Judgment With Rule 56(d) Discovery

### 1. Agreement Filed Under Seal Violates Adversarial Process

LCG states Agreement "will be provided to the Court under seal for review." Mem. at 4. **This procedural maneuver is fundamentally improper.**

**First, Rule 12(b)(6) does not permit ex parte document review.** Courts may only consider documents outside the pleadings if: (a) incorporated by reference in the complaint, or (b) treating the motion as one for summary judgment under Rule 56. Neither applies here. Plaintiff's Complaint references LCG's acquisition (¶ 16) but does not incorporate the APA or rely on its specific terms.

**Second, even if incorporation doctrine applied, Plaintiff has never seen this document.** LCG asks the Court to credit LCG's selective characterization -- "Walking Dead was excluded" -- without allowing Plaintiff to examine what was actually included. This violates basic adversarial principles.

**Third, LCG cherry-picks favorable language**. LCG quotes portions about "Excluded Games" while concealing:

- What trademark rights were transferred

- What licensing rights were retained

- What revenue streams were created

- How subsequent agreements (like Skybound's 2023 equity investment) modified the relationship

**Fourth, sealed submission prevents public scrutiny**. Even if Court reviews the APA in camera, Plaintiff cannot test LCG's characterization, cannot identify contradictory provisions, and cannot brief the actual implications of the document's terms.

**At 12(b)(6) stage, Court must accept Plaintiff's allegations as true.** Plaintiff alleges LCG profits from trademark licensing and Skybound equity (¶¶ 16-17). The existence of an APA does not refute these allegations -- it creates factual disputes requiring discovery.

**If Court considers the APA, Plaintiff must receive access (under protective order if necessary) and opportunity to brief its actual meaning.** Anything less denies Plaintiff due process.

## 2. Alternatively, If Court Considers the APA, Motion Must Be Converted to Summary Judgment and Discovery Must Be Permitted

If the Court considers the Asset Purchase Agreement or any other extrinsic documents submitted by LCG, the motion must be converted to one for summary judgment under Federal Rule of Civil Procedure 12(d). **When "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."** Fed. R. Civ. P. 12(d). Upon conversion, **"all parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."** Id.

LCG has presented multiple extrinsic documents:

- The Asset Purchase Agreement (to be filed under seal)

- LCG's Certificate of Good Standing (Ex. 1)

- Declaration of Dan Irish (Ex. 2)

None of these documents are incorporated by reference in Plaintiff's Complaint. The Complaint references LCG's acquisition (¶ 16) but does not quote from, rely on, or attach the APA. Under Fourth Circuit precedent, mere reference to a document's existence does not incorporate it. See *Philips v. Pitt*

*Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (document must be "integral to and explicitly relied on in the complaint" to be considered without conversion).

**If the Court considers these extrinsic materials, Plaintiff is entitled to conduct discovery under Rule 56(d) before responding.** Specifically, Plaintiff requires discovery on:

1. **The complete Asset Purchase Agreement**, including all schedules, exhibits, and amendments - not just cherry-picked excerpts submitted under seal by LCG

2. **All subsequent agreements** between LCG and Skybound, including:

   o The 2023 equity investment agreement referenced in press releases

   o Any trademark licensing agreements

   o Any revenue-sharing arrangements

   o Any agreements modifying the original APA terms

3. **Financial records** showing:

   o Revenue LCG derives from Telltale trademark licensing

   o Payments received from Skybound

   o The value of Skybound's equity stake

   o LCG's role in authorizing Walking Dead products bearing its trademark

4. **Documents showing LCG's control** over the Telltale trademark and its use on Walking Dead products

5. **Communications** between LCG and Skybound regarding Walking Dead products, trademark usage, and distribution

**Plaintiff cannot respond to LCG's factual assertions about the APA without access to the actual document and related discovery.** LCG claims the APA "specifically excluded" Walking Dead games (Mem. at 4), but Plaintiff has no means to verify this claim, examine what rights were actually transferred, or identify subsequent modifications to the arrangement. LCG's CFO Declaration makes sweeping factual assertions (Irish Decl. ¶¶ 1-32), but Plaintiff has had no opportunity to test these assertions through discovery or cross-examination.

**Rule 56(d) exists precisely for this situation.** "If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may... allow time to obtain affidavits or declarations or to take discovery." Fed. R. Civ. P. 56(d)(2). The Fourth Circuit has held that Rule 56(d) relief is appropriate when "the nonmoving party has not had the opportunity to discover information that is essential to his opposition." *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002).

Here, LCG asks the Court to resolve contested factual issues - the scope of LCG's acquisition, LCG's ongoing relationship with Walking Dead products, LCG's control over trademark usage - based solely on LCG's carefully curated submissions. This is exactly what Rule 56(d) prohibits. **Before the Court can consider whether the APA excludes Walking Dead games (and what that exclusion means for § 8.01-40 liability), Plaintiff must be permitted to conduct discovery on the actual terms of LCG's relationship with Walking Dead properties.**

**At minimum, if the Court considers LCG's extrinsic documents, Plaintiff must receive:**

- Access to the complete APA (under protective order if necessary)

- At least 60 days to conduct targeted discovery on the issues LCG has raised

- An opportunity to file a supplemental opposition brief after discovery

Anything less denies Plaintiff the procedural protections Rule 12(d) and Rule 56(d) guarantee.

**3. Even If Games Excluded, Trademark Rights Were Not**

LCG argument that games were "excluded," therefore no liability is a non sequitur.

Even if game source code/ownership were excluded:

**Trademark Rights Were NOT Excluded**: LCG admits it acquired "Telltale brand, trademarks, technology, and select IPs." Telltale trademark -- appearing on every Walking Dead game -- was acquired. Copyright notice "Telltale is a trademark of Telltale, Inc., used with permission" proves this trademark is used on Walking Dead products. LCG owns Telltale, Inc.

**Licensing Rights Not Excluded**: Nothing suggests LCG cannot license Telltale name/trademark for Walking Dead products. Agreement may have excluded game ownership while preserving LCG's right to license its trademark. This appears to be what's happening.

**Future Relationships Not Excluded**: Agreement signed May 21, 2019. Skybound's equity investment occurred February 2023 -- nearly four years later. Agreement cannot dictate LCG can never have any financial relationship with Walking Dead. Yet LCG now has that relationship through Skybound equity.

**Revenue Streams Not Excluded**: Even if LCG doesn't own games, LCG owns trademark appearing on them. Trademark licensing generates revenue independent of content ownership.

**LCG's selective quotation from the sealed Asset Purchase Agreement is telling**. LCG emphasizes what was allegedly "excluded" while remaining conspicuously silent about what was included: the Telltale trademark and brand. Every source confirms LCG acquired "Telltale brand, assets, and various IP" and "trademarks, technology". The copyright notice on every Walking Dead product -- "Telltale is a trademark of Telltale, Inc., used with permission" -- proves LCG's trademark appears on these products and that Skybound uses it "with permission" (i.e., pursuant to a licensing agreement).

**If the Asset Purchase Agreement truly excluded all Walking Dead involvement, why does LCG's trademark appear on Walking Dead products?** LCG cannot simultaneously argue "we acquired the Telltale trademark" and "Walking Dead was excluded" when the Telltale trademark is actively used on Walking Dead products with LCG's permission. The most logical explanation: LCG acquired trademark rights separate from game ownership, allowing LCG to license the Telltale brand to Skybound for use on Walking Dead products while technically not "owning" the game source code. This is exactly the type of factual nuance that cannot be resolved on a motion to dismiss and requires discovery into the actual licensing agreements.

**LCG's focus on what was "excluded" obscures what was included: Telltale brand and trademark rights.** These create basis for ongoing commercial exploitation and liability.

## 4. "Excluded from Purchase" ≠ "No Ongoing Commercial Relationship"

LCG treats "we didn't buy it" as equivalent to "we have nothing to do with it." **Not the same.**

Even if Walking Dead games excluded from 2019 acquisition, LCG subsequently:

- Received $8M equity investment from Skybound (February 2023)

- Continued licensing Telltale trademark for Walking Dead products

- Operated as "Telltale Games" to capitalize on Walking Dead-built recognition

- Profited from Telltale brand's value deriving from Walking Dead

**"We didn't buy it in 2019" does not answer "what is your commercial relationship with it in 2023-2025?"**

LCG's motion asks Court to stop inquiry at 2019, ignoring everything since. But Plaintiff's claims are based on **ongoing use (2019-2025)**, not 2019 acquisition. Asset Purchase Agreement does not address LCG's current trademark licensing, Skybound equity investment, or ongoing brand exploitation.

**These issues require discovery**. LCG cannot foreclose discovery by pointing to one 2019 document while hiding what happened 2020-2025.

## E. Personal Jurisdiction Exists or Discovery Required

### 1. LCG's Blanket Denials Are Conclusory

LCG cites *Coffin v. TGM Assocs.* LP, 2021 WL 1238560, at *4 (D. Md. 2021) and *Vision Motor Cars, Inc. v. Valor Motor Co*., 981 F. Supp. 2d 464, 468 (M.D.N.C. 2013) for proposition that "blanket conclusory allegations" grouping defendants are insufficient. Mem. at 11.

**LCG misapplies these cases.** Those cases involved plaintiffs making zero specific allegations about any defendant. Here, Plaintiff has alleged:

**Specific to LCG:**

- LCG owns Telltale trademark (admitted)

- LCG operates as "Telltale Games" (admitted)

- Products sold in Virginia bearing LCG's trademark

- Copyright notice: "Telltale... used with permission" (LCG's permission)

- Skybound (who sells in Virginia) uses LCG's trademark

- Skybound owns equity in LCG

These are **not** "blanket conclusory allegations" -- these are specific factual allegations about LCG's

commercial relationships creating Virginia contacts. Unlike the plaintiffs in Coffin and Vision Motor

Cars who made no defendant-specific allegations at all, Plaintiff has alleged that LCG specifically:

- Owns the Telltale trademark that appears on products sold to Virginia residents - Licenses that

trademark to Skybound "with permission" for use on Virginia-available products

- Operates as "Telltale Games" to capitalize on brand recognition in interstate commerce

- Receives financial benefit from Skybound's equity investment, which was explicitly tied to Walking

Dead revenue

- Authorized the use of its trademark on products sold through nationwide digital platforms accessible to

Virginia residents

These allegations are neither blanket nor conclusory -- they identify specific commercial conduct by

LCG that creates contacts with Virginia.

Dan Irish's declaration recites boilerplate denials (¶¶ 21-32) but never claims:

- "Walking Dead games are not sold to Virginia residents"

- "LCG receives no revenue from Virginia sales"

- "LCG's trademark does not appear on products sold in Virginia"

- "LCG has no commercial relationship with products sold in Virginia"

**The declaration's silence on these specifics is telling**. LCG cannot plausibly claim products sold on

major platforms available nationwide -- Steam, PlayStation, Xbox -- are not sold to Virginia residents.

## 2. Digital Distribution Creates Specific Jurisdiction

Walking Dead games sold via:

- Steam (available in Virginia)

- PlayStation Store (available in Virginia)

- Xbox (available in Virginia)

- Epic Games Store (available in Virginia)

- GOG (available in Virginia)

These platforms sell digitally to Virginia purchasers. Each Virginia sale:

- Involves product featuring "Thomas Richards"

- Displays "Telltale is a trademark of Telltale, Inc., used with permission"

- Generates revenue to Skybound (who uses LCG's trademark and owns LCG equity)

- Creates commercial transaction connected to Virginia

**LCG cannot credibly deny Virginia contacts when products bearing its trademark are sold through these nationwide platforms.** Dan Irish's declaration states LCG has no Virginia offices, employees, or bank accounts (¶¶ 21-32), but conspicuously never states:

- "Walking Dead products bearing LCG's trademark are not sold to Virginia residents"

- "LCG receives no revenue derived from Virginia sales"

- "LCG does not license its trademark for products available in Virginia"

- "Skybound does not sell Walking Dead products to Virginia customers"

**These omissions are fatal to LCG's jurisdictional challenge**. If LCG truly lacked sufficient minimum contacts with Virginia, Dan Irish would have stated these facts explicitly. His careful avoidance suggests

LCG knows it cannot truthfully deny that products bearing its trademark are sold to Virginia residents and that LCG derives financial benefit from those sales through trademark licensing fees and Skybound equity. When a defendant profits from sales to forum state residents -- even indirectly through trademark licensing and equity relationships -- personal jurisdiction exists.

Under *Bristol-Myers Squibb*, 582 U.S. at 264, specific jurisdiction requires "affiliation between forum and underlying controversy." Here, controversy involves unauthorized commercial use of Plaintiff's name. Products featuring that unauthorized use are sold to Virginia residents, Plaintiff's home forum where he suffers harm.

LCG's relationship with these sales -- through trademark licensing and equity -- creates minimum contacts with Virginia.

**The Fourth Circuit has consistently held that personal jurisdiction exists where a defendant's products reach forum state residents through established distribution channels, even when the defendant uses intermediaries.** In UMG Recordings, Inc. v. Kurbanov, 963 F.3d 344, 353-54 (4th Cir. 2020), the Fourth Circuit found personal jurisdiction based on the defendant's "globally accessible websites" that served Virginia residents and from which the defendant profited. The court held that purposefully directing commercial activity toward forum state residents -- even through digital platforms -- creates sufficient minimum contacts for specific jurisdiction. Critically, the court rejected the defendant's attempt to "distance himself from th[e] commercial arrangement by contending that any commercial relationship that may exist lies with [third-party] brokers." Id. at 353-54. The court held that when a defendant "facilitates targeted [activity] by collecting and selling visitors' data" and "earns revenues precisely because [the activity] is targeted to visitors in [the forum state]," personal jurisdiction exists. Id.

Here, LCG's trademark appears on products sold through established nationwide digital distribution platforms (Steam, PlayStation, Xbox, Epic, GOG) that serve Virginia residents. LCG licenses its trademark for use on these products and derives financial benefit through trademark licensing fees and

equity ownership in Skybound. This is precisely the type of "regular and anticipated flow" from trademark owner to distributor to Virginia consumers that supports personal jurisdiction. Just as the defendant in *UMG Recordings* could not escape jurisdiction by claiming third-party advertising brokers were the intermediaries, LCG cannot escape jurisdiction by claiming Skybound is the distributor while LCG merely licenses its trademark and profits from the arrangement.

### 3. Distinguished: Levi v. Twentieth Century Fox

LCG cites Levi v. Twentieth Century Fox Film Corp., 2017 U.S. Dist. LEXIS 49773 (E.D. Va. 2017), where court dismissed for lack of jurisdiction against TV show creators/producers because plaintiff (Virginia resident) did not allege facts showing defendants availed themselves of Virginia activities. Mem. at 12.

**Levi is distinguishable**:

**In Levi**: Plaintiff alleged defendants created TV content that was broadcast nationally, with no specific Virginia-directed conduct or commercial relationship creating Virginia contacts.

**Here**: Plaintiff alleges:

- LCG owns trademark appearing on products sold to Virginia residents

- LCG licenses that trademark to Skybound who sells in Virginia

- LCG receives equity investment from Skybound, creating financial stake in Virginia sales

- Products bearing LCG's trademark are actively marketed and sold in Virginia through multiple digital platforms

LCG is not a passive content creator. **LCG is an active trademark owner licensing its mark for use on products sold in Virginia and profiting from those sales through licensing fees and equity relationships**.

This creates the Virginia-specific contacts absent in Levi.

### 4. Trademark Licensing Revenue Derived from Virginia

If LCG receives trademark licensing fees from Skybound (as "used with permission" suggests), **a portion of those fees derives from Virginia sales.** Courts recognize revenue derived from forum state creates minimum contacts.

LCG cannot receive money generated partly from Virginia sales and simultaneously claim no Virginia contacts.

## VII. CONCLUSION

LCG's motion should be denied for multiple independent reasons.

**First, LCG's credibility is destroyed**. LCG fabricated a statistic by 62,000%, claiming 33,487 people share Plaintiff's name when the actual number is 53. This material misrepresentation -- repeated three times and used as the foundation of LCG's implausibility argument -- renders suspect every other factual assertion in LCG's motion, particularly the characterizations of sealed documents and unsupported denials in Dan Irish's declaration.

**Second, the corrected data proves Plaintiff's case is plausible**. With only 53 Thomas Richards nationwide, and Plaintiff possessing a documented connection to tax fraud (through Tony Alamo) being

related to someone with far worse crimes, combined with Kirkman's admitted pattern of naming villains after real people he dislikes, avoiding last names (except when referencing a real person), Plaintiff has alleged facts making identification not merely plausible but probable. Kirkman's conspicuous failure to deny targeting Plaintiff -- despite his public admissions about this naming practice -- further supports plausibility.

**Third, LCG concedes all material facts underlying Plaintiff's claims.** LCG does not dispute that defamatory content featuring "Thomas Richards" exists, continues to be commercially distributed, uses Plaintiff's name without consent, and causes harm. LCG argues only corporate structure defenses -- factual disputes requiring discovery, not grounds for dismissal on the pleadings.

**Fourth, LCG cannot simultaneously exploit and disclaim the Telltale-Walking Dead connection**. LCG holds itself out as "Telltale Games," profits from the Telltale brand built by Walking Dead's $300+ million success, licenses its Telltale trademark for Walking Dead products, and received $8 million in equity investment explicitly tied to Walking Dead revenue. Yet LCG claims "we have done nothing with respect to Walking Dead." This corporate shell game violates basic principles of fairness and should not immunize LCG from liability for ongoing commercial exploitation of Plaintiff's name.

**Fifth, LCG's procedural violations warrant denial.** LCG improperly attempts to incorporate "other Defendants' arguments" by reference in violation of Virginia and Fourth Circuit law. LCG seeks to rely on a sealed Asset Purchase Agreement that Plaintiff has never seen, preventing adversarial testing of LCG's selective characterizations. These procedural defects alone warrant denial.

**At minimum, Plaintiff is entitled to discovery regarding**:

1. Unredacted Asset Purchase Agreement

2. All trademark licensing agreements between LCG and Skybound

3. All revenue LCG receives from Skybound's Telltale trademark use

4. Terms and documents concerning Skybound's equity investment

5. All communications between LCG and Skybound regarding Walking Dead

6. LCG's role in September 2019 Definitive Series release

7. Sales data showing Walking Dead purchases by Virginia residents

8. LCG's actual commercial involvement with Walking Dead products

**The Court should**:

1. **Deny LCG's motion to dismiss** because LCG has failed to show Plaintiff can prove no facts entitling him to relief. LCG admits all factual predicates for valid claims and argues only affirmative defenses requiring discovery.

2. **Deny LCG's request for attorneys' fees** as baseless and designed solely to intimidate a solo practitioner representing her husband. A party that fabricates statistics by 62,000% while asking this Court to sanction Plaintiff has abused the judicial process and is entitled to nothing.

3. **Order jurisdictional discovery** if the Court has any doubt about personal jurisdiction, allowing Plaintiff to discover the full extent of LCG's Virginia contacts through trademark licensing and digital distribution.

4. **Require production of the Asset Purchase Agreement** if the Court considers it relevant, allowing Plaintiff to examine the document under protective order and brief its actual meaning rather than accepting LCG's selective characterization.

6.  **Strike or disregard LCG's improper incorporation by reference of other defendants' arguments**, in accordance with Rule 12(d) or alternatively allow limited discovery in accordance with Rule 56(d).

DATED: November 14, 2025

Respectfully Submitted,

/s/ Lisa Weingarten Richards
Lisa Weingarten Richards
LWR Law Offices
3060 Williams Dr
Ste 300 #510
Fairfax, VA 22031
Tel.: (202) 981-2059
lwr@lwrlawoffices.com
VSB #96671
Counsel for Plaintiff

---

**CERTIFICATE OF SERVICE**

I hereby certify that on November 14, 2025, a true and correct copy of the foregoing document was served upon all parties of record via the Court's ECF system.

/s/ Lisa Weingarten Richards
Lisa Weingarten Richards