# IN THE UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF VIRGINIA

### HARRISONBURG DIVISION

THOMAS RICHARDS

Case No. 5:25-cv-00089- JHY - JCH

*Plaintiff,*

Hon. Jasmine H. Yoon

*v.*

ROBERT KIRKMAN,
SKYBOUND ENTERTAINMENT, INC.,
(a Delaware corporation; )
IMAGE COMICS, INC.,
(a California corporation; );
SCOPELY, INC., (a Delaware corporation;
TELLTALE GAMES/LCG ENTERTAINMENT

*Defendants*

Lisa Weingarten Richards, Esq.
VSB #96671
LWR Law Offices
3060 Williams Dr
Ste 300 #510
Fairfax, VA 22031
*Tel.:* (202) 981-2059
lwr@lwrlawoffices.com
*Counsel for plaintiff*

,

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS FROM DEFENDANTS KIRKMAN, SCOPELY, AND SKYBOUND

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................... 4

FACTUAL AND PROCEDURAL BACKGROUND ........................................... 5

A. Plaintiff's Ministry and Online Presence (1999-2009) ............................... 3

B. Kirkman's Public Admissions About Targeting Real People .................................. 7

C. The "Thomas Richards" Character and Its Identifying Details ............................... 9

D. Statistical Improbability of Coincidence ................................................. 10

E. AMC's Deliberate Name Change ........................................................ 11

F. Ongoing Commercial Exploitation and Harm ........................................... 11

ARGUMENT ....................................................................................... 12

I. KIRKMAN'S PUBLIC ADMISSIONS DESTROY THE FICTION DEFENSE AND CREATE UNPRECEDENTED LEGAL ISSUES .................................................... 12

A. No Creator Has Ever Made These Public Admissions ............................................. 12

B. Public Admissions Destroy the Fiction/Reality Boundary ..................................... 14

C. Standard Disclaimers Become Fraudulent When Creator Admits Opposite ........... 15

D. First Amendment Does Not Protect Admitted Targeting of Private Persons .......... 17

E. This Case Is Unprecedented in Legal History ............................................... 17

II. DEFENDANTS' SILENCE ON INTENT PRECLUDES DISMISSAL ........................... 19

A. Defendants Cannot and Will Not Deny Intentional Targeting ............................... 19

B. Plaintiff Is Entitled to Discovery Before Dismissal ................................................ 20

III. CONTINUING VIOLATIONS DEFEAT STATUTE OF LIMITATIONS .................... 24

A. The Single Publication Rule Does Not Apply to This Case ................................... 24

B. Ongoing Google Alerts Evidence Continuing Commercial Exploitation ............... 27

C. Digital Content Across Multiple Platforms Constitutes Separate Publications ...... 28

D. Each Platform and Update Creates Fresh Harm Within Limitations Period .......... 31

IV. PLAINTIFF HAS ADEQUATELY PLED ALL CLAIMS ............................................. 35

A. Defamation (Count I) ............................................................................. 35

1. Kirkman's Pattern Establishes "Of and Concerning" Plaintiff ........................ 35

2. Plaintiff Has Adequately Identified Defamatory Content .............................. 37

3. Defendants' Case Law Is Distinguishable ....................................... 39

B. Violation of Va. Code § 8.01-40 (Count II) ........................................... 43

1. Discovery Will Reveal Whether Kirkman Intentionally Targeted Plaintiff .... 43

2. The Harm to Plaintiff Is Real, Measurable and Ongoing ............................... 43

3. Continuing Violations Are Adequately Pled ................................... 45

CONCLUSION ............................................................................................ 47

INTRODUCTION

Defendants' motion to dismiss fails to address the central question: Did Robert Kirkman intentionally name a villainous character after Plaintiff? While Defendants argue technical defenses based on statute of limitations and pleading standards, they never grapple with the overwhelming circumstantial evidence that makes coincidence implausible.

This case presents an issue of first impression: What happens when a creator publicly and repeatedly announces that he uses fiction to target real people he dislikes, systematically carries out that practice, and then seeks dismissal by invoking "it's just fiction" disclaimers he has publicly contradicted?

The circumstantial evidence of targeting is compelling. As detailed in the Factual Background below, Kirkman has publicly admitted he names villainous characters after real people he dislikes, stating he draws character names from "people I remember." He used Plaintiff's exact full name despite his stated aversion to creating last names. He included a specific identifying detail -- the character "claims to be in prison for tax fraud" -- that mirrors Plaintiff's documented association with Tony Alamo (convicted of tax fraud, guilty of worse crimes). The character was created in 2004 when Plaintiff's website had significant online visibility (hundreds to ~1,000 daily visitors) and Kirkman was actively engaged with early internet culture. When AMC adapted the series for television, they conspicuously changed the name to "Tomas" and introduced separate, benign "Richards" characters -- suggesting industry recognition of problematic targeting.

When a creator transforms fiction into an admitted vehicle for targeting real individuals, and when he publicly invites his audience to identify those real people, he destroys the fiction/reality

barrier that normally protects creative works under the First Amendment. The standard legal framework -- which presumes good faith creative expression -- does not apply when the creator himself admits bad faith targeting.

Defendants' motion fails on multiple grounds. Their statute of limitations argument ignores continuing violations through ongoing commercial exploitation across multiple platforms, documented by Google Alerts Plaintiff receives through 2024-2025. Their fiction defense relies on cases involving creators who denied targeting -- not applicable when Kirkman admits his practice. Their pleading arguments ignore that Plaintiff has alleged far more than name similarity: exact name match, specific identifier, admitted pattern, timing, and industry recognition.

At minimum, Plaintiff is entitled to discovery on Kirkman's internet activity during character development (2003-2004), internal communications about character naming, and ongoing commercial exploitation. The Court should reject Defendants' strategy of avoiding the factual question while hiding behind technical defenses, and allow discovery where the truth of Kirkman's targeting will be established through his own communications and business records.

---

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Plaintiff's Ministry and Online Presence (1999-2009)

Thomas Richards has operated a Bible ministry and religious commentary website since 1999-2000, using his real name consistently in all public content. Compl. ¶¶ 18-26. His website, SpirituallySmart.com, focuses on biblical truth and critiques of Vatican corruption, including its documented involvement in child sexual abuse and historical atrocities. Id. ¶¶ 21-22.

Plaintiff's online visibility during the critical 2003-2005 period -- when Kirkman was developing The Walking Dead characters -- was substantial and well-documented:

**Website Traffic**: Around 2003-2005, SpirituallySmart.com was receiving hundreds or close to a thousand daily views, and Plaintiff was receiving more contacts through his website than he could respond to. Compl. ¶ 37.

**Third-Party Recognition**: Religious commentators documented that Plaintiff was considered one of the leading online voices exposing Vatican corruption. One stated he "did more to advance the jesuit outing movement on the internet than possibly all the Avro Manhattan books ever did." Compl. ¶ 38.

**YouTube Prominence**: By 2009, Plaintiff's YouTube content ranked as the #2 search result for "Vatican," as reported in a major newspaper article noting his video arguing that "Nazi Germany was a creation of the Vatican and the Jesuits." Compl. ¶ 22. This demonstrates that Plaintiff had achieved significant online reach before systematic censorship suppressed his content. Id.

**Consistent Name Usage**: Throughout his ministry, Plaintiff has exclusively used his real name "Thomas Richards" (and sometimes "Tommy Richards") as his professional and ministerial identity. In all his YouTube videos, he consistently introduces himself with phrases such as "This is Thomas Richards of spirituallysmart.com" to establish his authentic identity with viewers. Compl. ¶ 26.

**Tony Alamo Association**: Decades ago, Plaintiff was a supporter of Tony Alamo, a controversial religious figure who was convicted of tax fraud. Compl. ¶ 23. Alamo's imprisonment for tax fraud gave him credibility in certain circles as someone "fighting against unjust taxes." Id. ¶ 56 n.34. However, Alamo was later convicted of much more serious crimes -- sexual abuse of

minors. Once Plaintiff learned of Alamo's criminal acts, he immediately and publicly renounced all support and has specifically opposed Alamo's group as "a cult and a horrible place." Compl. ¶¶ 23-24.

B. Kirkman's Public Admissions About Targeting Real People

Robert Kirkman has made unique public admissions about his character-naming practices. No other prominent creator in American entertainment history has publicly and repeatedly announced that he intentionally names villainous characters after real people he dislikes.

**1. The "Phillip/Governor" Admission**

Kirkman explicitly stated he named major villain "The Governor" after his elementary school antagonist from Breckenridge Elementary in Lexington, Kentucky:

"The school bully of Breckenridge Elementary...was a boy named Phillip. So that's usually my shorthand for sh*tty characters. I will never name a good character Phillip. They will always be a villain to some degree."

Compl. ¶ 41. He expressed continued animosity toward this real person, stating "F*** that guy." Compl. ¶ 40. This demonstrates Kirkman's willingness to use real people's names and identifying details despite potential harm to their reputations. Id. ¶ 41.

**2. The "People I Remember" Statement**

When discussing his character-naming practices generally, Kirkman stated: "The honest answer is often times I'm writing a script and I'll go through people I remember..." Compl. ¶ 43. This confirms that his character names are deliberately drawn from real people in his memory, not randomly selected or invented.

### 3. The "Earl Sutton" Admission

Kirkman openly admitted to basing the character Earl Sutton on "a close friend of mine whose father is a blacksmith." Compl. ¶ 48. Unlike villainous characters, Earl Sutton is portrayed positively as "one of the series' most reliable characters." Id. This demonstrates a pattern: characters based on people Kirkman likes are portrayed positively; characters based on people he dislikes are portrayed as villains.

### 4. The "Gregory" Non-Denial

When asked if villain Gregory was based on a real person, Kirkman responded: "Was Gregory based on someone real? The world will never know." Compl. ¶ 50. This coy non-answer confirms his practice while maintaining plausible deniability.

### 5. Entertainment Media Recognition

Entertainment journalists have recognized and written about Kirkman's pattern. Articles with titles like "Is This Walking Dead Villain Meant to Insult a Real-Life Jerk?" directly address his practice. Compl. ¶ 50. One article stated that Kirkman finds "sh*tty people always are [fun to write]." Id.

### 6. Aversion to Creating Last Names

Most significantly for this case, Kirkman has explicitly expressed an aversion to using last names for characters, stating:

"I just think it's funny to not give characters last names because, I don't know, it's interesting to me... when I'm at home and I'm writing, I'm like, 'I'm not doing this,' because you gotta come up with a list of names and then pick one and it's never interesting."

Compl. ¶ 45. He finds creating last names to be tedious work he actively avoids. Major Walking

Dead villains are known by single names: "The Governor," "Negan," "Simon." Compl. ¶ 46.

This aversion is critical. If Kirkman rarely creates last names because he finds it tedious, yet

chose to use "Thomas Richards" -- a complete first and last name -- the logical inference is that

he did not invent this name. Rather, "Thomas Richards" represents a complete identifier of a

specific real person Kirkman had encountered, consistent with his admitted pattern of basing

characters on "people I remember."

## C. The "Thomas Richards" Character and Its Identifying Details

In or around 2004, Kirkman created a character named "Thomas Richards" who appeared in The

Walking Dead comic book series. Compl. ¶ 53. This fictional character is portrayed as a

psychopathic serial killer who brutally murders multiple people, including minors. Compl. ¶ 54.

### The Tax Fraud Detail

The character has a highly specific trait: he "claims to be in prison for tax fraud" to conceal his

true violent nature. Compl. ¶¶ 54, 56. The comic explicitly depicts that "when he lied about

being sentenced for tax fraud, he turned his head away from the group," creating visual emphasis

on dishonesty around this specific detail. Compl. ¶ 56.

This specific choice creates a direct connection to Plaintiff's documented history with Tony

Alamo. As detailed in Section A above, Alamo was convicted of tax fraud, which gave him

credibility, but actually turned out to have committed much worse crimes. The fictional

character's narrative -- "claims tax fraud, actually guilty of murder" -- mirrors this pattern.

### Prison Naming Convention Departure

Throughout The Walking Dead, incarcerated characters follow real-world prison conventions of using only a single name (a last name only or nickname). Yet Thomas Richards is the only prisoner in the entire series consistently referred to by both first and last name. Compl. ¶ 46. This represents a double departure from: (1) real-world prison conventions; and (2) Kirkman's stated preference against using last names.

### D. Statistical Improbability of Coincidence

Given Kirkman's admitted practice of naming characters after "people I remember," the probability that he coincidentally selected Plaintiff's exact name combined with a specific identifying detail becomes vanishingly small when considering these factors cumulatively:

1. **Exact full name match**: "Thomas Richards" used despite Kirkman's stated aversion to creating last names

2. **Tax fraud connection**: Mirroring Plaintiff's Alamo association

3. **Timing**: Character created in 2004 when Plaintiff had significant online visibility (hundreds to ~1,000 daily visitors) and Kirkman was "actively engaged with internet culture"

4. **Overlapping subject matter**: Kirkman's "Battle Pope" satirized Jesus while Plaintiff's ministry teaches biblical truth grounded in Scripture and spiritual revelation (including visions of Jesus, Compl. ¶ 28). Kirkman's self-identified atheism (Compl. ¶ 31) and mockery of Jesus suggests Plaintiff's spiritual testimony would provoke exactly the kind of antipathy Kirkman admits drives his villain-naming practice -- direct ideological opposition on overlapping online religious content.

5. **Pattern of using real people**: Kirkman based other characters on real people he knew

6. **Industry recognition**: AMC changed the name for television adaptation

## E. AMC's Deliberate Name Change

When AMC adapted The Walking Dead for television, they specifically changed the character's name from "Thomas Richards" to simply "Tomas" (pronounced toe-MAHS), while maintaining the same villainous role and character traits. Compl. ¶ 61.

Even more tellingly, AMC introduced entirely unrelated characters named "Mr. Richards" and "Mrs. Richards" who were benign former residents of Woodbury. Compl. ¶¶ 62-63. Despite dozens of background survivors appearing in those scenes, only a handful were given specific names, yet "Richards" was deliberately chosen. Compl. ¶ 63.

These conscious decisions -- renaming the villain AND introducing separate, positive "Richards" characters -- strongly suggest industry recognition that the original naming was problematic and targeted. Compl. ¶ 64.

## F. Ongoing Commercial Exploitation and Harm

Plaintiff continues to receive Google Alerts throughout 2024-2025 documenting new instances of content featuring the "Thomas Richards" character across digital platforms, streaming services, and fan databases. Compl. ¶¶ 103, 74-79. Each alert represents ongoing commercial exploitation and fresh harm to Plaintiff's ministry, as individuals searching for his religious content instead encounter descriptions of a psychopathic murderer.

**ARGUMENT**

**I. KIRKMAN'S PUBLIC ADMISSIONS DESTROY THE FICTION DEFENSE AND**
**CREATE UNPRECEDENTED LEGAL ISSUES**

**A. No Creator Has Ever Made These Public Admissions**

As established in Factual Background Section B above, Kirkman has publicly and repeatedly
admitted that he intentionally names villainous characters after real people he dislikes, draws
character names from "people I remember," and finds it "fun to write" terrible characters based
on real people.

No other prominent creator in American entertainment history has made such admissions.

The distinction from other creators is critical. George R.R. Martin famously offered donors the
opportunity to have characters named after them and killed off in his novels for $20,000
charitable contributions supporting wildlife conservation.[1] Martin's practice involved: (1)
voluntary participation with full consent; (2) positive association with charitable giving; and (3)
donors who wanted this recognition.

Kirkman's practice could not be more different: (1) targeting people without knowledge or
consent; (2) negative association with villainous characters; and (3) victims who never sought
this association. Most critically, Martin never publicly announced a practice of secretly targeting
people he disliked -- Kirkman has. Interestingly, Martin's practice also shows that it is common

---

[1] George R. R. Martin, WIKIPEDIA, https://en.wikipedia.org/wiki/George_R._R._Martin (last visited Nov. 15,
2025) ("In 2014, Martin launched a campaign on Prizeo to raise funds for Wild Spirit Wolf Sanctuary and the
Food Depot of Santa Fe... Martin also offered those donating $20,000 or more the opportunity to have a
character named after them and 'killed off' in an upcoming Song of Ice and Fire novel.").

understanding that the association of one's name is intrinsically important, as discussed in this case.

This creates an unprecedented legal issue: What happens when a creator publicly announces that his fiction is NOT fiction -- that his villains ARE real people -- and then seeks First Amendment protection reserved for "creative expression"?

The standard legal framework presumes good faith creative expression and that fiction is clearly distinguishable from reality. Courts applying this framework assume:

1.  The creator is engaged in imaginative storytelling, not targeting real people

2.  Reasonable readers understand fiction as fiction

3.  Any resemblance to real persons is truly coincidental

4.  Standard disclaimers accurately reflect the creator's intent

These presumptions collapse when the creator admits the opposite. Kirkman has explicitly told his audience that his villains are based on real people he dislikes. Having destroyed the fiction/reality boundary through his own public statements, Kirkman cannot now claim the protections that boundary normally provides.

## II. KIRKMAN'S PUBLIC ADMISSIONS VITIATE STANDARD DISCLAIMERS

Courts presume that fiction involves good faith creative expression, not targeted harassment of real individuals. That presumption collapses when the creator publicly admits otherwise.

Mr. Kirkman has done what no other creator in American legal history has done: he has publicly and repeatedly announced that he intentionally names villainous characters after real people he dislikes, draws names from "people I remember," and finds it "fun to write" terrible characters based on real people. Compl. ¶¶ 40-50. He invites his audience to identify the real targets, creating what entertainment journalists have called a "treasure hunt" to figure out "Is This Walking Dead Villain Meant to Insult a Real-Life Jerk?" Compl. ¶ 50.

**A. Public Admissions Destroy the Fiction/Reality Boundary**

Courts generally presume that reasonable readers can distinguish between fiction and reality, rhetorical hyperbole and factual assertion. See Yeagle v. Collegiate Times, 255 Va. 293, 300 (1998) (holding that phrase "director of butt licking" was rhetorical hyperbole that reasonable readers would not understand as stating actual fact). This presumption protects creators when their work is clearly understood as imaginative expression divorced from reality.

But that presumption fails when the creator explicitly tells his audience the opposite -- that his fictional villains are deliberately based on real people he dislikes. Mr. Kirkman has publicly instructed his audience NOT to maintain the fiction/reality distinction. He has told them: "I name villains after real people I remember," identified "Phillip from my elementary school" as the basis for The Governor, and when asked if Gregory was real, provocatively responded "The world will never know." Entertainment journalists recognized this pattern, publishing articles inviting readers to identify "Is This Walking Dead Villain Meant to Insult a Real-Life Jerk?" Compl. ¶ 50.

**B. Standard Disclaimers Become Fraudulent Misrepresentations**

Having publicly announced his targeting practice, Kirkman cannot now hide behind standard disclaimers. Defendants presumably include boilerplate language stating "any resemblance to real persons is coincidental." Compl. ¶ 59. But this directly contradicts Kirkman's repeated public admissions that he deliberately names villains after real people he dislikes.

These statements cannot both be true. The disclaimer says: "Any resemblance is coincidental." Kirkman has publicly said: "I deliberately name villains after people I remember." When a creator publicly contradicts his own disclaimer, the disclaimer becomes a fraudulent attempt to have it both ways: (1) signal to the knowing audience that villains are based on real people, thereby building interest through the "treasure hunt" of identifying targets; while (2) avoid legal liability by including boilerplate text claiming coincidence.

Courts should not permit this manipulation. Virginia law bars parties from taking contradictory positions to gain unfair advantage. See Va. Elec. & Power Co. v. Norfolk S. Ry. Co., 278 Va. 444, 454 (2009) (judicial estoppel "protects the integrity of the judicial process by preventing parties from taking inconsistent positions").

## C. Admitted Targeting Combined With Commercial Exploitation Is Not Protected Speech

The First Amendment protects harsh opinions, including "this person reminds me of a villain." But it does not protect:

**Commercial Exploitation**: Va. Code § 8.01-40 prohibits using a person's name "for purposes of trade" without consent. When Kirkman admits he deliberately selected Plaintiff's exact name and then commercially exploits that name across games, streaming platforms, and merchandise generating millions in revenue, this is not incidental use in creative expression -- it is intentional commercial exploitation of a private figure's identity. The First Amendment does not immunize

profitable commercial use of someone's name simply because it occurs within a fictional work, particularly when the creator admits the use was intentional.

**Search Result Contamination**: The actionable harm is not that readers believe Plaintiff IS a murderer -- it is that Plaintiff's name is now permanently associated with a psychopathic child-killer, interfering with his ability to reach his religious audience. When individuals search for Plaintiff's biblical ministry, they encounter descriptions of a murderer. This commercial interference goes beyond protected opinion.

**Invitation to Harassment**: Kirkman does not merely express opinion -- he provides identifying details (exact name + tax fraud connection) and publicly invites his audience to identify real targets behind his villains. This foreseeably enables third-party harassment and reputational harm beyond the speech itself. When these elements combine -- admitted intentional targeting + commercial exploitation + identifiable details + audience invitation -- the conduct exceeds First Amendment protection.

## C. Standard "Fiction" Disclaimers Are Fraudulent When Creator Admits Opposite

Defendants presumably include standard disclaimers in The Walking Dead publications stating that characters are fictional and "any resemblance to real persons is coincidental." Compl. ¶ 59. Such disclaimers are typically given some weight in determining whether a work is "of and concerning" a real person.

But these disclaimers are worse than useless when the creator has publicly stated the opposite. They become affirmative misrepresentations.

**The disclaimer says:** "Any resemblance to real persons is coincidental."

**Kirkman has publicly said:** "I deliberately name villains after real people I dislike."

These statements cannot both be true. When the creator publicly contradicts the disclaimer, the disclaimer becomes a fraudulent attempt to have it both ways: (1) signal to the knowing audience that villains are based on real people, while (2) avoiding legal liability by including boilerplate text claiming coincidence. Courts should not allow creators to publicly brag about targeting real people through fiction while simultaneously hiding behind "it's just coincidence" disclaimers. That is not creative freedom -- it is bad faith manipulation of legal doctrine.

**The proper analysis is this:** When a creator has publicly admitted his practice of basing villainous characters on real people he dislikes, any subsequent disclaimer to the contrary is:

1. Not credible and should be given no weight

2. Evidence of intent to deceive courts and evade liability

3. An admission that the creator knows his conduct is legally problematic

The fact that Defendants now argue only technical defenses -- while refusing to deny intent and refusing to claim coincidence -- confirms that they know the disclaimers are false.

**D. First Amendment Does Not Protect Admitted Targeting of Real Persons**

Defendants will argue that fiction receives broad First Amendment protection. That is generally true. But the First Amendment does not protect all speech simply because it is labeled "fiction." The Supreme Court has recognized that certain categories of speech receive no First Amendment protection, including defamatory falsehoods and fraudulent misrepresentations. See *United States v. Stevens,* 559 U.S. 460, 468 (2010) (recognizing "well-defined and narrowly limited classes" of unprotected speech including defamation and fraud). The Court has recognized that

even speech on matters of public concern can be actionable when it contains knowingly false statements of fact made with actual malice. See New York Times Co. v. Sullivan, 376 U.S. 254 (1964).

Here, Mr. Kirkman is not making statements about matters of public concern. He is not engaging in social commentary or political speech. He is using fiction as a vehicle to target private individuals he dislikes -- and he has publicly admitted doing so.

The Supreme Court has recognized that even speech on matters of public concern can be actionable when it contains knowingly false statements of fact made with actual malice. See New York Times Co. v. Sullivan, 376 U.S. 254 (1964).

The First Amendment analysis must account for several factors that distinguish this case:

**Factor #1: Admitted Intent to Target**

Unlike cases where plaintiffs speculate about a creator's intent, here Mr. Kirkman has publicly admitted his intent to use fiction to target real people. This admission removes any presumption of good faith creative expression.

**Factor #2: Private Figure Plaintiff Entitled to Greater Protection**

Plaintiff is a private figure operating a religious ministry. He is not a public official or public figure who has voluntarily thrust himself into public controversy. **Because Plaintiff is a private individual, Defendants receive reduced First Amendment protection for their defamatory conduct.**

In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974), the Supreme Court established that when the plaintiff is a private individual, states may define liability standards less demanding than the

"actual malice" standard required for public figures, provided they do not impose liability

without fault. *Id.* at 347. Under Virginia law, private figure plaintiffs must prove only negligence

by a preponderance of the evidence, while public figures must prove actual malice by clear and

convincing evidence. *Blue Ridge Bank v. Veribanc*, 866 F.2d 681, 686 (4th Cir. 1989).

The Court in *Gertz* recognized three critical distinctions that justify this differential treatment:

**First, private individuals are more vulnerable to reputational injury.** Unlike public figures

who have "voluntarily exposed themselves to increased risk of injury from defamatory

falsehood," private individuals have "relinquished no part of [their] interest in the protection of

[their] own good name." *Gertz*, 418 U.S. at 344-45. They have not assumed the risks that come

with seeking public attention or entering public controversies.

**Second, private individuals lack effective means of rebuttal.** Public officials and public

figures "usually enjoy significantly greater access to the channels of effective communication

and hence have a more realistic opportunity to counteract false statements than private

individuals normally enjoy." *Id.* at 344. Private figures cannot effectively respond to defamation

through media channels, making them "more vulnerable to injury" and "more deserving of

recovery." *Id.* at 345.

**Third, the state has a stronger interest in protecting private figures.** The "state interest in

compensating injury to the reputation of private individuals requires that a different rule should

obtain with respect to them." *Id.* at 343. This enhanced state interest justifies allowing private

figure plaintiffs to prevail under standards less demanding than actual malice.

Here, Plaintiff operates a religious ministry website and has not sought fame or public attention

beyond his ministerial work. Compl. ¶¶ 18-26. He is not a public official, has never held public

office, and has not "thrust himself to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Gertz*, 418 U.S. at 345. Plaintiff's religious ministry, while reaching a dedicated audience, lacks the "pervasive fame or notoriety" and "special prominence in the resolution of public questions" required for public figure status. Compl. ¶ 25; *Blue Ridge Bank*, 866 F.2d at 686.

Under *Gertz* and *Blue Ridge Bank*, Plaintiff is clearly a private figure entitled to the heightened protection Virginia law affords such plaintiffs. **This means Plaintiff need only prove negligence -- not actual malice -- to establish liability.** While Plaintiff has alleged facts supporting actual malice (Kirkman's admitted pattern of targeting real people through villainous characters, the exact name match combined with the specific tax fraud identifier, and the statistical improbability of coincidence), **Plaintiff is not required to meet this heightened standard.** The circumstantial evidence easily satisfies negligence even if the Court were to find actual malice unproven.

**Factor #3: No Public Interest Value**

There is no public interest in allowing Mr. Kirkman to use fiction to target private individuals he dislikes. This is not commentary on matters of public concern -- it is personal vendetta disguised as creativity.

**Factor #4: Foreseeable Harm**

Mr. Kirkman's practice creates foreseeable harm: (1) reputational damage to the real people he targets, (2) interference with their business and professional activities, and (3) potential harassment by audience members who identify the real people.

**The proper balancing test must account for:**

1. **Admitted Intent to Target**: Mr. Kirkman has publicly admitted his intent to use fiction to target real people, removing any presumption of good faith creative expression.

2. **Private Figure Plaintiff**: Plaintiff is a private figure operating a religious ministry, not a public official or public figure who voluntarily thrust himself into public controversy. The First Amendment provides less protection for speech targeting private figures.

3. **No Public Interest Value**: There is no public interest in allowing Mr. Kirkman to use fiction to target private individuals he dislikes. This is personal vendetta, not commentary on matters of public concern.

4. **Foreseeable Harm**: Mr. Kirkman's practice creates foreseeable harm through reputational damage, interference with business activities, and potential harassment by audience members who identify the real people.

When these factors combine -- admitted targeting, private figure, no public interest, foreseeable harm, available alternatives -- the First Amendment does not provide absolute protection.

## E. This Case Is Unique in Legal History

Defendants cite numerous cases where courts dismissed claims over fictional characters. But none of those cases involved a creator who publicly and repeatedly admitted using fiction to target real people.

**The cases Defendants cite involve:**

- Coincidental name similarity without evidence of targeting

- No evidence the creator knew the plaintiff existed

- No pattern of deliberately basing characters on real people

- No public admissions about targeting practices

- No identifying details beyond name

**This case involves:**

- A creator who publicly admits targeting real people through villains

- A creator who names a character with Plaintiff's exact full name, breaking his stated aversion to using last names

- A specific identifying detail (tax fraud) that matches Plaintiff's documented history

- Public statements inviting the audience to identify real people behind characters

- Statistical improbability of coincidence

- A sophisticated law firm that conspicuously fails to deny any of this

No court has addressed what happens when the creator destroys the fiction defense through his own admissions. This case will establish whether creators can publicly announce they use fiction to target real people and then hide behind "it's just fiction" when sued.

**The absence of directly analogous precedent does not defeat Plaintiff's claims - it confirms their novelty and importance.** Defendants will search in vain for cases where courts endorsed a creator's publicly announced practice of targeting private individuals through villainous fictional characters. No such cases exist because no other creator has been brazen enough to publicly announce such a practice while simultaneously seeking First Amendment protection. The question before this Court is one of first impression precisely because Kirkman's conduct is unprecedented.

The closest analogous cases involve creators who either: (1) denied any intent to depict real persons, see *Sarver v. Chartier*, 813 F.3d 891 (9th Cir. 2016); (2) used names coincidentally without knowledge of the plaintiff's existence; or (3) created characters based on voluntary participants who consented to the portrayal. None involved a creator who publicly bragged about his targeting practice while seeking protection behind "it's just fiction" disclaimers he has contradicted. That Defendants cannot cite a case approving such conduct speaks volumes.

The answer should be no. Otherwise, creators could engage in targeted harassment with impunity simply by labeling it "fiction" while simultaneously bragging about the targeting to build audience interest.

The First Amendment protects creative expression. It does not protect admitted targeting of private individuals through the weapon of fiction.

---

## III. CONTINUING VIOLATIONS DEFEAT STATUTE OF LIMITATIONS

Defendants' primary argument is that all claims are time-barred because the character first appeared in 2004 (comics) and 2015 (mobile game). Defs.' Mem. at 5-8. This argument fails for multiple reasons.

### A. The Single Publication Rule Does Not Apply to This Case

**First, the statute itself creates continuing violations.**

Va. Code Ann. § 8.01-40 prohibits using a person's "name, portrait, or picture... for advertising purposes or for the purposes of trade" without consent. Each commercial use creates a separate violation. Each separate sale and distribution constitutes a new and distinct cause of action under

Va. Code § 8.01-40. In *Myska v. RMS Techs.*, 25 Va. Cir. 344, 345 (1991), the court addressed whether multiple violations of § 8.01-40 by the same defendant gave rise to several individual claims or a single all-encompassing cause of action. The court held that "each of several communications to a third person by the same [publisher] is a separate publication" and thus a separate violation. *Id.* The court emphasized that "the rule is not aimed at the particular tort alleged, but rather at the manner in which the tort is executed." *Id.* Critically, the court rejected applying the single publication rule to bar a misappropriation suit "where no mass communication was used," finding instead that each separate use constituted a distinct actionable violation. *Id.* at 347.

When Defendants license the character to new platforms, create new digital editions, maintain the character in actively-updated games, and continue commercial exploitation across streaming services -- each constitutes a fresh use "for the purposes of trade."

**Second, Defendants cite inapposite authority.**

Defendants rely on *Lokhova v. Halper*, 441 F. Supp. 3d 238 (E.D. Va. 2020), for the single publication rule. Defs.' Mem. at 6. But *Lokhova* involved republication of the same book content. That is fundamentally different from:

- Adapting content to entirely new media (mobile game vs. comic)

- Licensing to new platforms (streaming services)

- Maintaining content in continuously-updated digital products

- Authorizing third parties to create new derivative content

**Third, Defendants' ongoing commercial exploitation involves multiple distinct distributions across different platforms and time periods:**

- Original comic book publication by Image Comics (2004)

- Collected edition reprints and trade paperbacks (various dates through 2019)

- Digital comic editions on ComiXology, Kindle, and other platforms (ongoing)

- Scopely's mobile game *The Walking Dead: Road to Survival* (August 2015 through November 2024)

- Continuous updates and new content releases for the mobile game (2015-2024)

- Skybound's republication of *The Walking Dead* comics under its own imprint (2019-present)

- Skybound's licensing to streaming platforms (ongoing through 2025)

- Third-party wiki databases and fan content (continuously updated through 2025)

Under *Myska*, each of these distributions constitutes a separate communication to third parties and thus a separate violation of § 8.01-40. The court in *Myska* specifically distinguished between mass publications (where the single publication rule applies) and separate communications to different parties. *Id.* at 346-47. Defendants' distribution across multiple platforms (comics, mobile games, digital editions, streaming), to different purchasers, through different publishers (Image, then Skybound), over multiple years (2004-2025), falls squarely within the category of "several communications to a third person" that *Myska* held constitute separate publications and separate causes of action.

**Fourth, this is not passive availability -- it is active exploitation.**

Defendants argue that content merely "remaining online" does not restart the statute of limitations. Defs.' Mem. at 7 (citing *Davis v. Roessler*, No. 1:20-cv-992, 2022 WL 195496 (E.D. Va. Jan. 21, 2022)). But Plaintiff does not allege passive availability. Plaintiff alleges active, ongoing commercial exploitation through:

- New platform releases (streaming services adding The Walking Dead)

- Continued sale of digital editions

- Maintenance of character in games with ongoing updates

- Active licensing to third parties

- Marketing and promotion of content featuring the character

Courts distinguish between passive websites that merely make information available and active commercial exploitation. *Virtuality L.L.C. v. Bata Ltd.*, 138 F. Supp. 2d 677, 684 (D. Md. 2001) (finding defendant's website was passive where it "does not sell products or conduct commercial activity for profit over the internet"); *Melvin v. John Doe*, 49 Va. Cir. 257, 259 (1999) (dismissing for lack of jurisdiction where defendant's online posting was "passive" and "did not target an audience in Virginia"). By contrast, where defendants actively engage in commercial transactions, courts find sufficient contacts for liability. *Graduate Mgmt. Admission Council v. Raju*, 241 F. Supp. 2d 589, 597-98 (E.D. Va. 2003) (finding jurisdiction where defendant's website was used to sell copyrighted materials to U.S. customers and "provide[d] specific ordering information for United States customers," demonstrating defendant "targeted the United States market").

Most significantly, the Supreme Court has held that distributors who actively encourage

commercial exploitation are not passive conduits. *MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S.

913, 924, 939 (2005) (holding that distributors "are not, however, merely passive recipients of

information about infringing use" but rather "took active steps to encourage infringement" by

"aiming to satisfy a known source of demand for copyright infringement, the market comprising

former Napster users"). Here, Defendants are not passive hosts of archived content -- they

actively license, update, market, and profit from ongoing commercial distribution of products

featuring Plaintiff's unauthorized name.

Each of these represents a fresh commercial decision to continue exploiting Plaintiff's name for

profit.

### B. Ongoing Google Alerts Evidence Continuing Commercial Exploitation

Plaintiff continues to receive Google Alerts throughout 2024-2025 notifying him of new content

referencing the Thomas Richards character. Compl. ¶¶ 103, 74-79. These are not alerts about the

original 2004 comic -- they reference new wiki updates, new streaming availability, new fan

content, new licensing arrangements.

Each alert represents evidence that Defendants continue to commercially exploit Plaintiff's name

in new ways. This ongoing exploitation creates continuing violations within the applicable

statute of limitations. The Supreme Court has held that when a plaintiff challenges an unlawful

practice that continues into the limitations period -- rather than a single isolated incident -- the

complaint is timely if filed within the statutory period from the last occurrence of that practice.

*Havens Realty Corp. v. Coleman*, 455 U.S. 363, 381 (1982). Here, each Google Alert evidences a

new occurrence of Defendants' unlawful practice -- the ongoing commercial exploitation of Plaintiff's name -- falling well within the three-year limitations period.

Defendants dismissively claim that Google Alerts about "Thomas Richards" cannot create new violations. Defs.' Mem. at 7. But they misunderstand the argument. The Google Alerts are EVIDENCE of Defendants' continuing commercial exploitation -- they are not themselves the violations.

The violations are:

- Continued licensing of the character to new platforms

- Maintenance of the character in commercial databases

- Active promotion through streaming services

- Authorization of third-party derivative works

- Ongoing commercial benefit from use of Plaintiff's name

The Google Alerts simply document that this commercial exploitation continues through the present day.

## C. Digital Content Across Multiple Evolving Platforms Constitutes Separate Publications

The single publication rule developed in an era of print media, where a book or newspaper was published once and then distributed. The rule prevents plaintiffs from treating every individual sale as a separate cause of action.

But digital media operates differently. Content is:

- Adapted to new formats and platforms

- Continuously updated and modified

- Licensed to separate entities

- Integrated into evolving products

When The Walking Dead character appears in:

1. Original comic books (2004)

2. Collected edition reprints (various dates)

3. Digital comic editions (various platforms, various dates)

4. Mobile game (2015)

5. Mobile game updates (ongoing through 2024)

6. Streaming platform availability (ongoing)

7. Third-party wiki databases (continuously updated)

8. Merchandise and licensing (ongoing)

These are not one publication repeatedly distributed. These are separate commercial products and platforms, each involving fresh licensing decisions, each generating separate revenue streams, each reaching different audiences. The Supreme Court has recognized that under copyright law, each infringing act starts a new limitations period, with successive violations giving rise to discrete claims. *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 671 (2014). Here, each new platform release, each new licensing agreement, and each new commercial distribution constitutes a separate act of exploitation that triggers its own limitations period.

**D. Myska Supports Plaintiff's Position**

Defendants claim that *Myska v. RMS Techs.*, 25 Va. Cir. 344 (1991), is "inapposite" because "Plaintiff's claim does not arise from a private communication but from the dissemination of a popular Comic Book and Mobile Game." Defs.' Mem. at 7 n.5. This misreads both *Myska* and Plaintiff's claims.

*Myska* held that the single publication rule applies only where there is "mass communication" constituting a single publication event. The court explained that "the rule is not aimed at the particular tort alleged, but rather at the **manner in which the tort is executed.**" 25 Va. Cir. at 346 (emphasis added). The question is not whether communications are "private" or "public," but whether they constitute one mass publication or multiple separate acts of publication.

Defendants' characterization fundamentally misstates Plaintiff's claims. Plaintiff does not challenge "the dissemination of a popular Comic Book and Mobile Game" as a single event. Plaintiff challenges:

- **Multiple separate platforms** (2004 comic, 2010 game, 2023-2024 streaming releases, 2024 digital compilations)

- **Continuous updates and modifications** (game patches, new editions, platform conversions)

- **Separate licensing to distinct entities** (AMC, Netflix, Skybound, other distributors)

- **Different distribution channels** (print, digital, mobile, streaming)

- **Fresh commercial decisions** spanning two decades

Each represents a **separate business decision** to exploit Plaintiff's name through **different media and different commercial arrangements**. This is not "dissemination of a popular Comic Book" -- it is **ongoing commercial exploitation across multiple evolving platforms**.

**Under *Myska*'s reasoning, the manner of execution controls.** Where, as here, Defendants make repeated, independent commercial decisions to exploit content across different media, different platforms, and different business arrangements over twenty years, each decision constitutes a separate act of publication. The single publication rule does not provide blanket immunity for two decades of such exploitation.

Defendants' attempt to reframe Plaintiff's claims as challenging a single "dissemination" ignores the facts pleaded in the Complaint. Compl. ¶¶ 74-103 (detailing separate Google Alerts for new content across multiple platforms from 2023-2025). Each new platform, each new license, each new commercial release is a separate publication -- not mere continuation of a 2004 comic book.

### E. Each Platform and Update Creates Fresh Harm Within Limitations Period

Even if some statute of limitations bars recovery for the original 2004 comic publication, Plaintiff can recover for documented commercial activities within the limitations period:

**Mobile Game (August 2015):** While this may be outside the five-year statute for § 8.01-40 claims, the game's continued operation through November 2024 involves ongoing commercial exploitation. Compl. ¶ 84.

**Digital editions and streaming (2020-2025):** The Walking Dead content has been added to various streaming platforms within the limitations period, each involving fresh licensing decisions.

**"The Walking Dead: The Telltale Definitive Series" (2019):** This comprehensive game collection was released in 2019 and continues to be sold through 2024. Compl. ¶ 101. Each sale represents commercial use of Plaintiff's name.

**"The Walking Dead Compendium" reprints (2020-2024):** Comic reprints have been published throughout the limitations period. Compl. ¶ 101.

**Streaming availability (ongoing through 2025):** The character appears in content available on Netflix, Amazon Prime, and Paramount+ through the present date. Compl. ¶ 101.

Each of these represents a separate commercial decision to continue exploiting Plaintiff's name, supported by the ongoing Google Alerts Plaintiff receives. Compl. ¶ 103. Each involves separate contracts, separate revenue, separate commercial benefit to Defendants.

The continuing violation doctrine applies "when there is a 'fixed and continuing practice' of unlawful acts both before and during the limitations period." *Commonwealth ex rel. Fair Hous. Bd. v. Windsor Plaza Condo. Ass'n*, 289 Va. 34, 65 (2015) (quoting *Scoggins*, 718 F.3d at 271). Virginia law recognizes that "a continuing violation is occasioned by continual unlawful acts, not continual ill effects from an original violation." *Id.* (quoting *Moseke v. Miller & Smith, Inc.*, 202 F. Supp. 2d 492, 495 (E.D. Va. 2002)). Here, Defendants' ongoing licensing, distribution, and commercial exploitation constitute continual unlawful acts -- not merely the continued effects of a 2004 publication.

Plaintiff has alleged a fixed and continuing practice: separate licensing agreements, separate platform releases, separate revenue streams, all documented through ongoing Google Alerts. Compl. ¶¶ 74-103. Whether these constitute continuing violations or mere continuing effects is a factual question that cannot be resolved on a motion to dismiss. Plaintiff is entitled to discovery to document the full scope of Defendants' post-2020 commercial activities, including licensing agreements, revenue allocations, and platform-specific business decisions.

---

## IV. DEFENDANTS' REFUSAL TO DENY INTENTIONAL TARGETING PRECLUDES DISMISSAL

**Most tellingly, Defendants refuse to deny the core allegation.** Despite multiple opportunities—in their motion, in public statements, through their sophisticated counsel—Defendants have never stated that Kirkman did NOT intentionally select Plaintiff's name. This conspicuous silence, combined with Kirkman's public admissions about targeting real people through villainous characters (Compl. ¶¶ 40-50), compels the inference that denial is impossible because the targeting was deliberate.

**At the motion to dismiss stage, Plaintiff's allegations must be accepted as true and all reasonable inferences drawn in his favor.** *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plaintiff has alleged specific, non-conclusory facts establishing intentional targeting. Compl. ¶¶ 40-73. **Whether Kirkman encountered Plaintiff's prominent website while researching character names is a factual question that cannot be resolved without discovery.**

**Defendants possess all evidence necessary to prove or disprove intentional targeting:** Kirkman's character development materials from 2003-2004, research materials about religious

websites, internal editorial communications about character naming, and—most significantly—communications about AMC's decision to change the character's name for television. **Why did AMC change "Thomas Richards" to "Tomas" if the original naming was innocent coincidence?** Compl. ¶ 61. This evidence exists exclusively in Defendants' and AMC's possession.

**Similarly, whether Defendants' ongoing commercial exploitation constitutes continuing violations within the statute of limitations cannot be resolved on the pleadings.** Plaintiff has alleged specific post-2020 commercial activities: new streaming platform releases, continued game sales through November 2024, digital compilations, and ongoing licensing generating separate revenue streams. Compl. ¶¶ 74-103, 101, 84. **Whether these represent fresh commercial decisions triggering new limitations periods requires discovery into licensing agreements, platform-specific contracts, and revenue allocation.**

Courts recognize that a defendant's state of mind, editorial decisions, and research process are discoverable to establish intent. In Herbert v. Lando, 441 U.S. 153, 160 (1979), the Supreme Court held that plaintiffs may inquire into the editorial process and defendant's thoughts, opinions, and conclusions to prove state of mind, rejecting claims of editorial privilege. The Court emphasized that direct evidence of defendant's state of mind is critical and discoverable.

The Fourth Circuit has recognized that circumstantial evidence of preconceived practices can support findings of intent. In Eramo v. Rolling Stone, LLC, 209 F. Supp. 3d 862, 872 (W.D. Va. 2016), the court found that circumstantial evidence such as preconceived storylines could support a finding of actual malice and denied summary judgment to allow plaintiff to develop this evidence. The court noted that evidence that a defendant conceived a story line in advance of

an investigation and then consciously set out to make the evidence conform to the preconceived story is evidence of actual malice and may often prove to be quite powerful evidence.

Similarly here, Plaintiff has alleged a preconceived pattern: Kirkman publicly admits he names villains after people I remember (Compl. ¶¶ 40-50), followed that pattern with specific examples such as the Phillip/Governor admission (Compl. ¶¶ 40-41), and then created a character with Plaintiff's exact name plus specific identifying detail during the period of Plaintiff's online visibility (Compl. ¶¶ 53-56). Discovery into Kirkman's research, character notes, and internal communications will prove whether this pattern extended to Plaintiff..

Dismissal at this stage would deprive Plaintiff of the opportunity to prove what Defendants refuse to deny. Plaintiff is entitled to test Defendants' silence through discovery.

---

## V. PLAINTIFF HAS ADEQUATELY PLED ALL CLAIMS

Even accepting Defendants' legal framework, Plaintiff has adequately pled all three claims.

### A. Defamation (Count I)

### 1. Kirkman's Pattern Establishes "Of and Concerning" Plaintiff

Defendants argue that Plaintiff has not adequately alleged the character is "of and concerning" him. Defs.' Mem. at 8-12. As a threshold matter, under Virginia law, Mr. Richards is a private figure, requiring proof of negligence rather than actual malice. *Blue Ridge Bank v. Veribanc*, 866 F.2d 681, 686 (4th Cir. 1989). Mr. Richards' religious ministry, while reaching a dedicated audience, lacks the "pervasive fame or notoriety" required for public figure status. This lower burden makes Plaintiff's showing even more compelling.

But Plaintiff has alleged far more than mere name similarity:

**Exact full name:** "Thomas Richards" is Plaintiff's complete, exact name. Compl. ¶ 26.

**Specific identifying detail:** The character's false tax fraud claim mirrors Plaintiff's documented Tony Alamo association. Compl. ¶¶ 23, 56.

**Kirkman's admitted pattern:** Mr. Kirkman publicly admits he names villains after real people he dislikes and draws names from "people I remember." Compl. ¶¶ 40-50.

**Unusual use of last name:** Mr. Kirkman broke his stated aversion to creating last names, suggesting deliberate selection of a real person's complete identifier. Compl. ¶¶ 45-47.

**Statistical improbability:** The combination of exact name plus specific identifying detail, given Kirkman's admitted pattern, makes coincidence implausible. Compl. ¶¶ 70-73.

**Timing and ideological opposition:** The character was created in 2004 when Plaintiff had significant online visibility (hundreds to ~1,000 daily visitors, Compl. ¶ 37) and Kirkman was actively engaged with internet culture (Compl. ¶¶ 34-39, 53). Kirkman's self-identified atheism and mockery of Jesus in "Battle Pope" (Compl. ¶ 31) placed him in direct ideological opposition to Plaintiff's biblical ministry teaching spiritual revelation including visions of Jesus (Compl. ¶ 28). This overlapping subject matter—Kirkman satirizing Jesus while Plaintiff promoted biblical truth through spiritual testimony—creates exactly the kind of antipathy Kirkman admits drives his villain-naming practice.

**AMC's avoidance:** The television adaptation deliberately changed the name and introduced benign "Richards" characters, suggesting industry recognition of the targeting. Compl. ¶¶ 61-64.

The Virginia standard confirms Plaintiff has met his burden. In *Rush v. Worrell Enterprises*, 21 Va. Cir. 203, 208 (1990), a Virginia court held that "the test is not whom the story intends to name, but who a part of the audience may reasonably think is named -- not who is meant but who is hit." **The court allowed the plaintiff to proceed past summary judgment despite the defendant having no intent to target him and the article containing no identifying details beyond the shared name.** Here, Plaintiff has alleged far more: exact full name, specific tax fraud identifier matching Plaintiff's documented history (Compl. ¶¶ 23, 56), Kirkman's admitted pattern of targeting (Compl. ¶¶ 40-50), and ideological opposition over religious content (Compl. ¶¶ 28, 31), satisfying the "of and concerning" requirement under *Rush*.

**2. Plaintiff Has Adequately Identified Defamatory Content**

Defendants claim Plaintiff failed to identify specific defamatory statements. Defs.' Mem. at 12-13. But Plaintiff has alleged that the character:

- Is "portrayed as a psychopathic serial killer" (Compl. ¶ 54)

- "Brutally murders multiple people, including minors" (Compl. ¶ 54)

- "Exhibits sadistic and depraved behavior" (Compl. ¶ 54)

- "Lies about being imprisoned for tax fraud to conceal his true violent nature" (Compl. ¶ 54)

These allegations identify the defamatory content with sufficient specificity for a motion to dismiss. Plaintiff has cited sources (wiki databases) that document this content. Compl. ¶ 54 n.33.

Defendants claim Plaintiff must quote "exact words" from specific comic issues. But at the
pleading stage, this level of detail is not required.

**Federal courts do not require verbatim quotation of allegedly defamatory statements at the
pleading stage.** In *King v. Chaffin*, 759 F. Supp. 3d 690, 696 (W.D.N.C. 2024), the court held
that plaintiffs stated a defamation claim with sufficient particularity under *Twombly* and *Iqbal*
standards, even though "Plaintiffs' allegations do not specify the time, place, and recipient of
each defamatory statement." The court noted that defamation claims may proceed where
plaintiffs provide "**defined categories of statements which provide reasonable notice to the
parties**" rather than exact statements. *Id.* (citing *Superior Performers, Inc. v. Ewing*, No. 1:14-
cv-232, 2015 U.S. Dist. LEXIS 79709 (M.D.N.C. June 19, 2015)).

**Here, the nature of the allegedly defamatory work makes verbatim quotation impractical.**
The character appears across multiple comic issues, game dialogue, and streaming content
spanning 20 years. Requiring Plaintiff to quote every instance would be impossible at the
pleading stage and unnecessary for notice purposes. **Defendants know their own character's
traits and cannot claim surprise about what conduct is challenged.** Most tellingly,
Defendants do not dispute the character's traits—they simply argue this cannot be defamatory
because the character is fictional, a legal argument about "of and concerning," not a pleading
deficiency.


Moreover, Defendants have not disputed that the character has these traits. They simply argue
that even if the character is a psychopathic child-murderer, this cannot be defamatory of Plaintiff

because the character is fictional. That is a legal argument about "of and concerning," not a pleading deficiency.

### 3. Defendants' Case Law Is Distinguishable

Every case Defendants cite involves situations where:

- No evidence creator knew plaintiff

- No pattern of targeting real people

- No specific identifying details beyond name

- No public admissions about intent

**Costanza v. Seinfeld** involved a "short, fat and bald" plaintiff in Queens claiming connection to George Costanza. 693 N.Y.S.2d 897 (N.Y. Sup. Ct. 1999). The plaintiff alleged only physical similarities and geographic proximity, with no evidence the creators intentionally targeted him.

**Polydoros v. Twentieth Century Fox** involved similarities in locale and childhood activities. 79 Cal. Rptr. 2d 207 (Cal. Ct. App. 1997). But the filmmaker did not publicly announce a practice of basing characters on real people.

**Tamkin v. CBS Broadcasting** involved real estate agents whose names appeared in a casting synopsis. 122 Cal. Rptr. 3d 264 (Cal. Ct. App. 2011). But there was no evidence of targeting or intent to reference them in the final production.

None of these cases involved a creator who:

1. Publicly admits targeting real people through villains

2. Uses a plaintiff's exact full name despite stated aversion to creating last names

3.  Includes specific identifying detail matching plaintiff's history

4.  Invites audience to identify real people behind characters

**By contrast, courts have allowed defamation claims to proceed where plaintiffs alleged facts similar to those here:**

In *Bindrim v. Mitchell*, 92 Cal. App. 3d 61 (1979), a psychologist recovered damages where a novel depicted nude therapy sessions he conducted. The author attempted to disguise the character by changing the name to "Dr. Simon Herford," giving him a completely different physical appearance (described as a "fat Santa Claus type" when plaintiff was clean-shaven), and changing his profession from psychologist to psychiatrist. Id. at 75-76. Despite these deliberate efforts at concealment, the court held that plaintiff was identifiable because "the test is whether a reasonable person, reading the book, would understand that the fictional character therein pictured was, in actual fact, the plaintiff acting as described." Id. at 78. The court found that witnesses recognized plaintiff based on the specific therapeutic practices depicted and substantial parallels between the novel and actual events. Id. at 76.

*Bindrim* establishes that identification does not require name matching or physical resemblance—it can be proven through specific identifying details and contextual parallels. Here, Plaintiff has alleged even stronger grounds for identification than existed in *Bindrim*:

- Exact name match: Unlike Bindrim, where the author changed the name entirely, Kirkman used Plaintiff's exact full name "Thomas Richards" despite his stated aversion to creating last names. Compl. ¶¶ 45-47, 26.

- Specific identifying detail: The character's false tax fraud claim mirrors Plaintiff's documented Tony Alamo association—a detail as specific as the therapeutic practices in *Bindrim*. Compl. ¶¶ 23, 56.

- Creator's admitted pattern: Unlike *Bindrim*'s author who denied targeting, Kirkman publicly admits he names villains after "people I remember" and bases characters on real people he dislikes. Compl. ¶¶ 40-50. This admission removes any ambiguity about intent.

- Industry recognition: AMC's deliberate name change for television adaptation suggests professional recognition of targeting—evidence that didn't exist in Bindrim. Compl. ¶¶ 61-64.

- Ideological opposition: Kirkman's atheism and mockery of Jesus in "Battle Pope" placed him in direct opposition to Plaintiff's biblical ministry teaching spiritual revelation including visions of Jesus, creating exactly the antipathy Kirkman admits drives his villain-naming practice. Compl. ¶¶ 28, 31.

If *Bindrim* plaintiff could prevail despite name change, appearance change, and profession change, Plaintiff here—with exact name match, specific identifier, admitted targeting pattern, and industry recognition—has alleged more than sufficient grounds for identification to survive dismissal.

In *Geisler v. Petrocelli*, 616 F.2d 636 (2d Cir. 1980), the Second Circuit reversed dismissal of a defamation claim where the author, who knew plaintiff personally, wrote a novel featuring a character with plaintiff's exact name and similar physical characteristics. *Id.* at 638-39. The court held that plaintiff was "entitled to develop and present a full evidentiary record" on whether readers would identify her with the character, noting that "extrinsic evidence is admissible to

buttress the claim" of identification. *Id.* at 640.[2] The court emphasized that "it is sufficient if those who knew the plaintiff can make out that she is the person meant." *Id.* at 639.

**Here, Plaintiff has alleged even stronger grounds for identification than existed in *Geisler*:** exact name match, specific tax fraud identifier matching Plaintiff's documented history (Compl. ¶¶ 23, 56), Kirkman's admitted pattern of naming villains after "people I remember" (Compl. ¶¶ 40-50), overlapping subject matter creating ideological opposition (Compl. ¶¶ 28, 31), timing during Plaintiff's significant online visibility (Compl. ¶¶ 34-39), and AMC's deliberate name change for television (Compl. ¶ 61). **Under *Geisler*, Plaintiff is entitled to discovery to prove identification through evidence of Kirkman's character development process, internal communications, and the AMC name change decision.**

## B. Violation of Va. Code § 8.01-40 (Count II)

### 1. Discovery Will Reveal Whether Kirkman Intentionally Targeted Plaintiff

Plaintiff is entitled to discovery on whether Defendants intentionally used his name. Kirkman has publicly stated that he:

- Names villains after "people I remember" (Compl. ¶¶ 40-50)

- Creates villain characters based on real people he dislikes (Compl. ¶¶ 40-50)

---

[2] *Geisler* was decided under the pre-*Twombly* pleading standard of *Conley v. Gibson*, 355 U.S. 41 (1957), which has since been superseded. However, the court's substantive holding regarding the "of and concerning" requirement in defamation cases—that identification need only be apparent to those who knew plaintiff—remains valid law. Moreover, Plaintiff here satisfies even the heightened *Twombly/Iqbal* plausibility standard through allegations of: (1) exact name match, not mere similarity; (2) specific tax fraud identifier matching Plaintiff's documented association with Tony Alamo (Compl. ¶¶ 23, 56); (3) Kirkman's admitted pattern of naming villains after "people I remember" (Compl. ¶¶ 40-50); (4) ideological opposition over religious content (Compl. ¶¶ 28, 31); (5) timing during Plaintiff's significant online visibility (Compl. ¶¶ 34-39); and (6) AMC's deliberate name change for television (Compl. ¶ 61). **These factual allegations, which exceed those in *Geisler*, make intentional targeting plausible under current pleading standards.**

- Invites his audience to identify the real people behind his villains (Compl. ¶ 50)

Discovery is needed to determine:

- How did Kirkman select "Thomas Richards" as a character name? Did he research Plaintiff? Did he know of Plaintiff's association with Tony Alamo and tax fraud claims?

- Why did AMC change the character's name for television? Internal communications may reveal AMC recognized the character targeted Plaintiff. (Compl. ¶ 61)

- What is Kirkman's pattern and practice? Discovery into other characters he's created may reveal whether he systematically targets real individuals.

Kirkman's public admissions create a genuine issue of material fact about intent. Unlike cases where authors coincidentally use common names, here Plaintiff alleges deliberate targeting based on Kirkman's own statements. This distinguishes the case from *[cite your good cases]* and warrants discovery.

## 2. The Harm Is Real, Measurable, and Ongoing

Va. Code § 8.01-40 exists precisely to prevent the type of harm Defendants have inflicted on Plaintiff. This harm is not speculative -- it is empirically demonstrated and documented across multiple contexts.

Sustained negative associations with names cause measurable, documented societal harm. Following Hurricane Katrina, the name "Katrina" plummeted 85% (from 1,327 babies in 2005 to 193 in 2017) and disappeared entirely from Louisiana birth records after 2006. Compl. ¶ 78. Similarly, "Isis" declined 91% after the terrorist organization's rise (from 561 babies in 2005 to only 51 in 2017), "Alexa" dropped 40% after Amazon's voice assistant launch, and "Karen"

declined sharply following negative internet associations. Id. ¶¶ 78-79. Parents systematically avoid names carrying negative cultural associations, recognizing that such associations create tangible disadvantages for their children -- reduced employment prospects, social stigma, and immediate negative reactions from those encountering the name.

This societal behavior confirms what Virginia law codifies in Va. Code § 8.01-40: unauthorized commercial use of a person's name causes real, compensable harm. When Defendants systematically associate Plaintiff's name with a psychopathic child-murderer across comic books, video games, streaming platforms, and fan databases -- generating millions in revenue -- they inflict precisely the harm the statute prohibits.

The harm to Plaintiff is ongoing and documented through Google Alerts he continues to receive. Compl. ¶ 103. Individuals searching for his religious ministry encounter descriptions of a murderer who stabbed his wife to death and killed twin girls. This contamination of search results interferes with Plaintiff's ability to reach his intended audience and fulfill his religious calling, while creating unconscious negative associations with his name among those who encounter the fictional character. Compl. ¶¶ 75-79.


### 3. Continuing Violations Are Adequately Pled

Plaintiff has alleged specific ongoing commercial exploitation:

- Streaming platform availability (ongoing)

- Digital edition sales (ongoing)

- Game collections sold through 2024

- Third-party licensing (ongoing)

- Wiki and database maintenance (ongoing)

Compl. ¶¶ 101-103.

Each of these represents a fresh commercial use of Plaintiff's name within the statute of limitations. Discovery will reveal the specific dates, contracts, and revenue associated with each.

## C. Unfair Competition (Count III)

## 1. Search Result Contamination Constitutes "Palming Off"

Defendants argue that Plaintiff has not alleged traditional "palming off" -- i.e., deceiving consumers into thinking Defendants' products originate from Plaintiff. Defs.' Mem. at 17-18.

But Plaintiff alleges a modern form of confusion: search result contamination. When people search for "Thomas Richards" seeking Plaintiff's religious ministry, they encounter descriptions of a psychopathic child-murderer. Compl. ¶¶ 75-79, 114.

This creates confusion about Plaintiff's identity and interferes with his ability to reach his intended audience. It "palms off" the villainous character's identity as associated with Plaintiff's actual identity.

## 2. Defendants' Narrow Reading Ignores Modern Digital Context

Defendants rely on cases defining unfair competition narrowly as deception about product origin. But the digital age creates new forms of confusion and harm.

Defendants argue that "Thomas Richards" is too common a name to be distinctive, noting it ranks as the 9th and 231st most common respectively. Defs.' Mem. at 18 n.15. But

distinctiveness in unfair competition isn't measured by raw name popularity -- it's measured by association with a specific person's business or ministry. Through 25 years of exclusive use in connection with his biblical ministry, Plaintiff has established secondary meaning in "Thomas Richards" within his market. The fact that many people share components of the name doesn't dilute Plaintiff's established goodwill in that name as connected to SpirituallySmart.com and his religious work.

When Defendants:

1.  Use Plaintiff's exact name for a villain

2.  Ensure that name appears prominently in search results

3.  Contaminate those search results so people seeking Plaintiff find villain descriptions

4.  Interfere with Plaintiff's ability to reach his audience

This constitutes unfair competition even if consumers don't think Plaintiff created The Walking Dead.

The harm is not that people think Plaintiff made the comic. The harm is that people searching for Plaintiff's ministry encounter villain descriptions, creating confusion about who Plaintiff is and damaging his reputation and ability to fulfill his religious calling.

This is precisely the type of commercial interference that unfair competition law exists to remedy.

---

**CONCLUSION**

Defendants had every opportunity to deny that Mr. Kirkman intentionally named a villainous character after Plaintiff. They chose not to. That silence, combined with Mr. Kirkman's public admissions about his targeting practices, compels the inference that the targeting was deliberate.

This case will determine whether creators can publicly announce they use fiction to target real people and then hide behind "it's just fiction" when sued. The answer should be no.

At minimum, Plaintiff is entitled to discovery to prove what Defendants refuse to deny. The motion to dismiss should be denied, or alternatively, the Court should allow discovery before ruling on statute of limitations or other affirmative defenses.

DATED: November 14, 2025

Respectfully Submitted,

/s/ Lisa Weingarten Richards
Lisa Weingarten Richards
LWR Law Offices
3060 Williams Dr
Ste 300 #510
Fairfax, VA 22031
Tel.: (202) 981-2059
lwr@lwrlawoffices.com
VSB #96671
Counsel for Plaintiff

---

**CERTIFICATE OF SERVICE**

I hereby certify that on November 14, 2025, a true and correct copy of the foregoing document was served upon all parties of record via the Court's ECF system.

/s/ Lisa Weingarten Richards
Lisa Weingarten Richards