IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF VIRGINIA

HARRISONBURG DIVISION

THOMAS RICHARDS

                                              Case No. 5:25-cv-00089- JHY - JCH

                    *Plaintiff,*                Hon. Jasmine H. Yoon

         *v.*

ROBERT KIRKMAN,
SKYBOUND ENTERTAINMENT, INC.,
(a Delaware corporation; )
IMAGE COMICS, INC.,
(a California corporation; );
SCOPELY, INC., (a Delaware corporation;
TELLTALE GAMES/LCG ENTERTAINMENT
                    *Defendants*

                                              Lisa Weingarten Richards, Esq.
                                              VSB #96671
                                              LWR Law Offices
                                              3060 Williams Dr
                                              Ste 300 #510
                                              Fairfax, VA 22031
                                              *Tel.:* (202) 981-2059
                                              lwr@lwrlawoffices.com
                                              *Counsel for plaintiff*

**PLAINTIFF'S OPPOSITION TO DEFENDANT IMAGE COMICS' MOTION TO
DISMISS**

## TABLE OF CONTENTS

INTRODUCTION

I. IMAGE'S MOCKERY UNDERMINES ITS CREDIBILITY…………………………...........4

II. IMAGE IGNORES RUSH V. WORRELL - THE CONTROLLING STANDARD…………9

III. KIRKMAN'S PUBLIC ADMISSIONS DESTROY THE FICTION DEFENSE…………..16

IV. PLAINTIFF IS A PRIVATE FIGURE ENTITLED TO HEIGHTENED PROTECTION…17

V. CONTINUING VIOLATIONS DEFEAT STATUTE OF LIMITATIONS…………………18

VI. PLAINTIFF HAS ADEQUATELY PLED ALL CLAIMS…………………………………23

VII. DEFENDANTS' REFUSAL TO DENY INTENTIONAL TARGETING PRECLUDES

DISMISSAL……………………………………………………………………………………..30

CONCLUSION…………………………………………………………………...…………..32

**INTRODUCTION**

Image Comics' motion to dismiss fails to address the central question: Did Robert Kirkman intentionally name a villainous character after Plaintiff? While Image argues technical defenses based on statute of limitations and pleading standards, it never grapples with the overwhelming circumstantial evidence that makes coincidence implausible.

This case presents an issue of first impression: What happens when a creator publicly and repeatedly announces that he uses fiction to target real people he dislikes, systematically carries out that practice, and then seeks dismissal by invoking "it's just fiction" disclaimers he has publicly contradicted?

The circumstantial evidence of targeting is compelling. Kirkman has publicly admitted he names villainous characters after real people he dislikes, stating he draws character names from "people I remember." He used Plaintiff's exact full name despite his stated aversion to creating last names. He included a specific identifying detail -- the character "claims to be in prison for tax fraud" -- that mirrors Plaintiff's documented association with Tony Alamo (convicted of tax fraud). The character was created in 2004 when Plaintiff's website had significant online visibility and Kirkman was actively engaged with early internet culture. When AMC adapted the series for television, they conspicuously changed the name to "Tomas" and introduced separate, benign "Richards" characters -- suggesting industry recognition of problematic targeting.

When a creator transforms fiction into an admitted vehicle for targeting real individuals, and when he publicly invites his audience to identify those real people, he destroys the fiction/reality barrier that normally protects creative works under the First Amendment. The standard legal framework -- which presumes good faith creative expression -- does not apply when the creator himself admits bad faith targeting.

Image's motion fails on multiple grounds. Their statute of limitations argument ignores continuing violations through ongoing commercial exploitation across multiple platforms, documented by Google Alerts Plaintiff has continued to receive through 2024-2025. Their fiction defense relies on cases involving creators who denied targeting -- not applicable when Kirkman admits his practice. Their pleading arguments ignore that Plaintiff has alleged far more than name similarity: exact name match, specific identifier, admitted pattern, timing, and industry recognition. At minimum, Plaintiff is entitled to discovery on Kirkman's internet activity during character development (2003-2004), internal communications about character naming, and ongoing commercial exploitation.

## I. IMAGE'S MOCKERY UNDERMINES ITS CREDIBILITY

Image's brief ridicules Plaintiff's claims with phrases like "Jenga Tower of speculations," "Six Degrees of Kevin Bacon parlor trick," and "time machine to transport readers from 2003... back to 1994... Back to the Future to 2004." Image Mem. at 2-5. Image compares Plaintiff's requested relief to George Orwell's totalitarian dystopia in 1984. Id. at 25. Image describes Plaintiff's theory as having "suspension of disbelief...attenuated to the point of non-existence." Id. at 2.

Image fundamentally misunderstands the timeline. There is no "time machine" needed. In 2003-2004, when Kirkman created the Thomas Richards character, Plaintiff had briefly associated with Tony Alamo - a nationally infamous religious figure whose 1994 tax fraud conviction was widely covered in the media. Compl. ¶¶ 23, 43. Alamo later revealed himself to be far worse than a tax evader: in 2009, he was convicted of heinous crimes against children and sentenced to 175 years in federal prison. Plaintiff immediately and publicly renounced Alamo upon learning of these crimes. Compl. ¶ 23 & n.6.

Image's suggestion that connecting Plaintiff to Tony Alamo requires implausible leaps of logic is factually wrong. Tony Alamo was not an obscure cult leader. He was famous and ultimately became infamous. He and his wife Susan were celebrities who designed custom jackets for Elvis Presley, Michael Jackson, Mr. T. and other Hollywood stars. Compl. ¶¶ 23, 43. Tony Alamo's story was prominent enough to be featured in President Bill Clinton's autobiography, "My Life" (2004), published the same year Kirkman created the Thomas Richards character.[1] His tax fraud case was national news,[2] setting precedent as "a very big deal" that gave him credibility as "someone fighting against unjust taxes." Compl. ¶ 56 n.34. Tony Alamo's death in 2017 also received major publicity,[3] and his story remains so newsworthy that mainstream media continues to feature him and Susan Alamo in headline coverage as recently as November 2025. [See Exhibit B]

Alamo's tax conviction was not hidden history requiring retrospective excavation - it was his calling card. The tax fraud detail was a CURRENT reference in 2004. By having the fictional character LIE about being imprisoned for tax fraud when he was actually guilty of far worse violent crimes, Kirkman was implying something sinister underlay the tax conviction - a reference that made the tax fraud detail pointed and deliberate, not coincidental.

Anyone engaged with religious controversy or interested in exposing religious corruption - as Kirkman demonstrated through his "Battle Pope" series mocking both Jesus and the Catholic Church - would know about Tony Alamo and his tax fraud conviction, particularly because

---

[1] BILL CLINTON, MY LIFE 232 (2004) (In his memoir, President Bill Clinton recalled attending a Dolly Parton concert in Alma, Arkansas, organized by Tony and Susan Alamo, describing Tony as someone who "looked like Roy Orbison on speed" and noting that the Alamos "sold fancy performance outfits in Nashville to many of the biggest country music stars." Clinton explained that Tony had been "a promoter of rock-and-roll concerts back in California" before meeting Susan, a television evangelist who had "white-blond hair and often wore floor-length white dresses to preach on TV." According to Clinton, Tony "promoted her as he had his rock and rollers," and together "they built a small empire, including a large farming operation manned by devoted young followers.)

[2] Associated Press, *Jury Convicts An Evangelist Of Tax Evasion*, N.Y. Times, June 12, 1994, at 30.

[3] Associated Press, *Tony Alamo, Apocalyptic Ministry Leader Convicted of Sex Abuse, Dies at 82*, N.Y. Times (May 3, 2017), https://www.nytimes.com/2017/05/03/us/obituary-tony-alamo-minister-sexual-abuse.html.

part of Tony Alamo's fame was associated with his criticism of the Catholic Church, related to his publication, entitled, The Pope's Secrets.[4] (This work is thought by many to have been plagiarized by Alamo and an attempt to adopt a historically popular viewpoint to lend credibility to his work). The tax fraud detail was not a random selection requiring time-travel logic. It was a current, pointed reference to a famous religious figure's well-known criminal conviction.

Most significantly, Plaintiff Thomas Richards was not merely a peripheral supporter of Tony Alamo - he was featured prominently in Tony Alamo's internationally distributed newsletter in 1997. (Upon information and belief, it has been handed out for decades afterwards and is still distributed in physical form today.) Tony Alamo's ministry published Plaintiff's testimony titled "Checking it out with the Scriptures in Long Island" with Plaintiff's photograph and full name "Tommy Richards, Long Island, NY" on the front cover. [See Exhibit C - Tony Alamo Ministry Newsletter, Oct. 1997].[5] The newsletter states it is "printed by the millions, translated into many languages, and distributed worldwide" with responses "from over two hundred countries." *Id.* Plaintiff appeared in a second Alamo newsletter as well, cementing his public association with Tony Alamo's ministry. See Thomas Richards, Testimony, in Alamo Christian Ministries World Newsletter 2-3 (Nov. 1998), https://www.alamoministries.com/Newsletters/November-98.pdf. Tony Alamo's newsletters remain publicly accessible online at alamoministries.com decades later. [See Exhibit D - Screenshot showing newsletter remains online] Moreover, Baylor University has permanently archived the October 1997 newsletter featuring Plaintiff in its Digital Collections, confirming the historical significance and widespread distribution of these materials. [See Exhibit E -

---

[4] Tony Alamo, *The Pope's Secrets*, Tony Alamo Christian Ministries (1983, rev. 2006, 2012, 2013, 2014, 2016), https://alamoministries.com/content/english/Antichrist/Popes_Secrets.html.
[5] Tommy Richards, *Checking it out with the Scriptures in Long Island*, in *Alamo Christian Ministries World Newsletter* (Oct. 1997), https://www.alamoministries.com/Newsletters/Oct-97.pdf.

Baylor University Digital Collections][6] Any researcher, student, or creator investigating Tony Alamo or religious movements would find Plaintiff's name and testimony through Baylor's academic database.[7]

Any internet search for "Tony Alamo" in 2003-2004 - when Kirkman was creating the Thomas Richards character - would return these newsletters featuring "Tommy Richards from Long Island" by name and photograph. Academic databases like Baylor University's Digital Collections have permanently archived these newsletters, making them readily discoverable by anyone researching religious movements, cult leaders, or controversial religious figures. [Exhibit E] In addition to appearing on the internet, these newsletters were also widely distributed throughout the country for many years, put on people's cars en masse in parking lots, mailed, handed out, etc. Image's argument that connecting Plaintiff to Tony Alamo - and thus making Plaintiff discoverable by anyone researching Alamo, including Kirkman - required implausible leaps of logic is thus factually impossible. Plaintiff was literally featured on the front cover of Alamo's international newsletter. The connection between Tommy Richards and Tony Alamo was not attenuated - it was published, photographed, (often translated) and distributed worldwide.

---

[6] Alamo Christian Ministries, *Alamo Christian Ministries World Newsletter* (Oct. 1997), Baylor University Digital Collections, https://digitalcollections-baylor.quartexcollections.com/Documents/Detail/alamo-christian-ministries-world-newsletter/810181.

[7] The Court may consider Exhibits C, D, and E without converting this motion to summary judgment. Courts may consider documents attached to a motion to dismiss "so long as they are integral to the complaint and authentic." *Philips v. Pitt Cnty. Mem'l Hosp.,* 572 F.3d 176, 180 (4th Cir. 2009) (citing *Blankenship v. Manchin*, 471 F.3d 523, 526 n.1 (4th Cir. 2006)). Additionally, courts "may properly take judicial notice of matters of public record." Id. (*citing Hall v. Virginia*, 385 F.3d 421, 424 (4th Cir. 2004). Here, both requirements are satisfied. First, Plaintiff's Complaint repeatedly references his documented association with Tony Alamo (Compl. ¶¶ 23, 43, 56 & n.34), making the October 1997 newsletter - which memorializes that public association - integral to Plaintiff's "of and concerning" allegations. Second, these exhibits are undisputedly authentic public documents: published on Tony Alamo Ministries' official website (Exhibit D) and permanently archived in Baylor University's Digital Collections (Exhibit E). Image Comics cannot credibly dispute the authenticity of documents publicly available on official websites and archived by a major research university. See *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014) (considering deed of trust attached to motion to dismiss where "integral to the complaint and authentic").

This rhetorical strategy is backward for three reasons. First, courts evaluate motions to dismiss based on whether Plaintiff has stated plausible claims, not whether defense counsel can craft clever mockery. The Fourth Circuit has repeatedly emphasized that courts must accept all well-pled facts as true and construe them in the light most favorable to the plaintiff. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc*., 637 F.3d 435, 440 (4th Cir. 2011).

Second, Image's mockery cannot refute the statistical reality established by Kirkman's own admissions. Kirkman has publicly stated that he draws character names from "people I remember" rather than inventing them. Compl. ¶ 43. He has also explicitly expressed an aversion to using last names for characters, stating: "I just think it's funny to not give characters last names because...when I'm at home and I'm writing, I'm like, 'I'm not doing this,' because you gotta come up with a list of names and then pick one and it's never interesting." Compl. ¶ 45. He finds creating last names to be tedious work he actively avoids. Major Walking Dead villains are known by single names: "The Governor," "Negan," "Simon." Compl. ¶ 46.

Given this admitted practice, when Kirkman uses a complete first-and-last-name combination, he is not inventing a name - he is selecting a real person's complete identifier from "people I remember." The statistical analysis is straightforward: Kirkman's own statements establish that "Thomas Richards" represents a deliberate selection of a real person, not random name generation. Image's speculation that this could be coincidence contradicts Kirkman's public admissions about his naming process.

We can therefore state with virtual certainty that Kirkman was targeting SOME specific Thomas Richards. The only question is which one. The tax fraud connection - tying to Plaintiff's then-current, publicly visible support of a tax-fraud-convicted religious figure and

implying a far more sinister criminal character - combined with ideological opposition over biblical content, identifies Plaintiff as the specific target.

Third, Plaintiff has brought serious claims supported by detailed factual allegations and controlling Virginia law. Those claims deserve substantive legal response, not dismissive ridicule.

Image never asserts Kirkman was referring to a different Thomas Richards. It simply labels Plaintiff's theory "implausible" without providing any alternative explanation. At the pleading stage, Plaintiff need only allege facts making targeting plausible - which the Complaint does through Kirkman's admitted naming pattern, the exact name match, the specific identifier, ideological opposition, and timing. Image bears the burden of showing these allegations are insufficient as a matter of law. Substituting mockery for analysis does not meet that burden.

## II. IMAGE IGNORES RUSH V. WORRELL - THE CONTROLLING STANDARD

Image devotes substantial argument to attacking whether Kirkman knew of or intended to target Plaintiff. Image Mem. at 3, 12-13. But Virginia law makes defendant's intent irrelevant to the "of and concerning" analysis.

In *Rush v. Worrell Enterprises*, 21 Va. Cir. 203, 208 (1990), the court held: "the test is not whom the story intends to name, but who a part of the audience may reasonably think is named - not who is meant but who is hit."

This standard controls. The question is not whether Kirkman intended to target Plaintiff - it is whether part of the audience could reasonably identify Plaintiff as the person depicted.

Critically, *Rush* allowed plaintiff to proceed past summary judgment despite: (1) defendant had no intent to target plaintiff, and (2) the article contained no identifying details beyond a shared name. *Rush*, 21 Va. Cir. at 208.

Here, Plaintiff has alleged far more: exact full name match (Compl. ¶ 26); specific tax fraud identifier matching Plaintiff's documented Tony Alamo association during the relevant 2003-2004 period (Compl. ¶¶ 23, 56); Kirkman's admitted pattern of naming villains after "people I remember" (Compl. ¶¶ 40-50); overlapping subject matter creating ideological opposition (Kirkman's atheism and Jesus-mockery vs. Plaintiff's biblical ministry teaching visions of Jesus) (Compl. ¶¶ 28, 31); timing during Plaintiff's significant online visibility (Compl. ¶¶ 34-39); and AMC's deliberate name change for television adaptation (Compl. ¶ 61).

Under *Rush*, Plaintiff easily satisfies the "of and concerning" standard. Image's twenty-eight pages attacking intent miss the actual legal test entirely.

Image argues that Plaintiff's theory of "unconscious linking" fails *Schaecher v. Bouffault*'s "of and concerning" requirement. Image Mem. at 19. This misunderstands both *Schaecher* and Plaintiff's theory.

*Schaecher* addressed whether statements about Person A (an employee) were "of and concerning" Person B (the business owner). 772 S.E.2d at 598. The issue was whether defamation of an employee could support a claim by the employer. That's not this case.

Here, the defamatory statements are ABOUT "Thomas Richards" and Plaintiff IS "Thomas Richards." The character has Plaintiff's exact name, specific identifying details, and was created consistent with Kirkman's admitted pattern of naming villains after "people I remember." Compl. ¶¶ 26, 40-50, 56.

More fundamentally, Image misreads *Schaecher*. In *Schaecher*, the court held certain statements non-defamatory because "the potential violation of an easement...does not as a general principle carry the 'sting' of a reprehensible crime." 772 S.E.2d at 595-96. The court emphasized that "the mere implication that one might be in violation of an easement, absent more...does not rise to the level of defamation." *Id.* at 596.

Here, the "sting" is vastly different. Associating Plaintiff's name with a "psychopathic serial killer who brutally murders multiple people, including minors" and "exhibits sadistic and depraved behavior" (Compl. ¶ 54) carries exactly the kind of severe reputational harm Schaecher requires. The difference between "might violate easement rules" and "psychopathic child-murderer" demonstrates why *Schaecher* supports Plaintiff, not Image.


**"Unconscious linking" simply describes the psychological mechanism by which audiences connect the character to Plaintiff** - it's not a separate legal element Image can attack. This psychological phenomenon is universally recognized: people naturally avoided naming their children names like "Katrina" or "Isis" after negative associations developed through prominent events or media coverage. Compl. ¶ 77-78. Virginia law implicitly recognizes this reality in Va. Code § 8.01-40, which prohibits unauthorized commercial use of names precisely because such use causes measurable harm to reputation and identity. George R.R. Martin's practice of accepting $20,000 donations for consensual character naming demonstrates the substantial value people place on name associations[8] - making unauthorized association with villains proportionally harmful.

---

[8] George R.R. Martin, WIKIPEDIA, https://en.wikipedia.org/wiki/George_R._R._Martin (last visited Nov. 15, 2025) ("In 2014, Martin launched a campaign on Prizeo to raise funds for Wild Spirit Wolf Sanctuary and the Food Depot of Santa Fe... Martin also offered those donating $20,000 or more the opportunity to have a character named after them and 'killed off' in an upcoming Song of Ice and Fire novel.").

The legal standard remains *Rush*: "who a part of the audience may reasonably think is named." *Rush*, 21 Va. Cir. at 208. Under *Rush*, Plaintiff easily satisfies "of and concerning."

**Image's Employment Discrimination Cases Are Inapplicable**

Image relies on *Francis v. Giacomelli*, 588 F.3d 186 (4th Cir. 2009), and *Burgis v. New York City Dep't of Sanitation*, 798 F.3d 63 (2d Cir. 2015) - both employment discrimination cases requiring proof of discriminatory intent. Image Mem. at 4, 10. These cases are inapplicable for three reasons.

First, *Giacomelli* supports Plaintiff. *Giacomelli* dismissed a racial discrimination claim (in which the plaintiff was alleging mistreatment due to race – black) where a white employee (Romano) "complained of the exact same treatment in every other count of the complaint, belying any claim of discriminatory treatment." 588 F.3d at 195. The court held that if someone *outside* the targeted class receives identical treatment, it negates the discrimination claim.

Here, no one outside Plaintiff's category receives the same treatment. Kirkman has never claimed any villain's name was randomly chosen - he explicitly states villain names come from "people I remember." Compl. ¶ 43. Image concedes this point even while stating that somehow the naming pattern only applies to full character names who are positively portrayed. Image notes that the only other full-name character they identify - Earl Sutton - was explicitly based on "a close friend of mine." Image Mem. at 14-15; Compl. ¶ 48. But this simply confirms that when Kirkman uses complete first-and-last names, he is selecting real people's identifiers, not inventing names. (He does not regularly use full first-and-last-name combinations for villains and actively avoids creating last names. Compl. ¶ 45.) "Thomas Richards" is the unique exception, making it appear highly likely that an individual was specifically targeted and supports targeting under *Giacomelli*'s logic.

Second, *Burgis* supports Plaintiff. *Burgis* dismissed a discrimination claim based on "raw percentages" without "any detail as to the comparative number of individuals at each level, the qualifications of individuals in the applicant pool and of those hired for each position." 798 F.3d at 70. The court required context beyond bare numbers.

Plaintiff has provided exactly that context:

- Selection pool: Kirkman admits he draws names from "people I remember" (Compl. ¶ 43)

- Selection pattern: Kirkman avoids last names; broke pattern for "Thomas Richards" (Compl. ¶¶ 45-47)

- Specific identifier: Tax fraud detail matching Plaintiff's Alamo association (Compl. ¶ 56)

- Timing: Character created when Plaintiff's website had significant visibility (Compl. ¶ 37)

- Industry recognition: AMC changed the name for television (Compl. ¶ 61)

- Defendant's admissions: "People I remember," Phillip/Governor targeting pattern (Compl. ¶¶ 40-50)

This is precisely the contextual detail *Burgis* found lacking.

Third, Image applies the wrong legal standard. *Giacomelli* and *Burgis* analyzed whether plaintiffs adequately alleged **intentional discrimination** under § 1981 and the Equal Protection Clause. *Giacomelli*, 588 F.3d at 195; *Burgis*, 798 F.3d at 68-70.[9] Both cases

---

[9] *Burgis* also raised a Title VII disparate impact claim, which does not require proof of discriminatory intent. 798 F.3d at 71. But the court dismissed that claim on procedural grounds for failure to exhaust administrative

rejected claims where plaintiffs provided either conclusory allegations or insufficient statistical evidence of discriminatory intent.

But defamation law does not require proof of defendant's intent. Under *Rush*, the "of and concerning" element asks: "who a part of the audience may reasonably think is named - not who is meant but who is hit." *Rush*, 21 Va. Cir. at 208. Image's entire strategy of attacking Kirkman's knowledge and intent is legally irrelevant. Even if Kirkman somehow did not intend to target Plaintiff, the question is whether audiences could reasonably identify Plaintiff - which the exact name match, specific identifier, admitted naming pattern, and timing make inescapable.

Image cannot import intent requirements from employment discrimination law into defamation's "of and concerning" analysis. The standards are fundamentally different.

## III. KIRKMAN'S PUBLIC ADMISSIONS DESTROY THE FICTION DEFENSE

Courts generally presume reasonable readers can distinguish fiction from reality. *Yeagle v. Collegiate Times*, 255 Va. 293, 300 (1998). This presumption protects creators whose work is clearly understood as imaginative expression divorced from reality.

**But that presumption fails when the creator explicitly tells his audience the opposite.**

Kirkman has publicly instructed his audience NOT to maintain the fiction/reality distinction. He has admitted he names villains after "people I remember" (Compl. ¶ 43), identified Phillip from Breckenridge Elementary as the basis for The Governor while expressing continued animosity toward him (Compl. ¶¶ 40-41), and when asked if villain Gregory was based on a

---

remedies without reaching the merits. *Id.* Both *Giacomelli* and *Burgis* failed because plaintiffs could not establish discriminatory intent through conclusory allegations or raw statistics lacking context. Here, Plaintiff has provided extensive context: Kirkman's admitted pattern of naming villains after "people I remember" (Compl. ¶ 43), his aversion to creating last names (Compl. ¶ 45), the exact name match with specific identifier (Compl. ¶¶ 26, 56), timing during Plaintiff's online visibility (Compl. ¶ 37), and industry recognition through AMC's name change (Compl. ¶ 61). Even under an intent-based standard, Plaintiff's allegations far exceed those in *Giacomelli* and *Burgis*.

real person, provocatively responded "The world will never know" (Compl. ¶ 50).

Entertainment journalists recognized this pattern, publishing articles asking "Is This Walking Dead Villain Meant to Insult a Real-Life Jerk?" (Compl. ¶ 50).

Having publicly announced his targeting practice, Kirkman cannot now hide behind standard disclaimers. When a creator publicly states he names villains after real people he dislikes yet includes boilerplate language claiming "any resemblance to real persons is coincidental," the disclaimer becomes fraudulent. Virginia law bars parties from taking contradictory positions to gain unfair advantage. *Va. Elec. & Power Co. v. Norfolk S. Ry. Co.*, 278 Va. 444, 454 (2009).

The cases Image cites involve creators who denied targeting. None involved a creator who publicly and repeatedly admitted using fiction to target real people, then claimed First Amendment protection for that admitted practice. This distinction is dispositive.

**IV. PLAINTIFF IS A PRIVATE FIGURE ENTITLED TO HEIGHTENED PROTECTION**

Image argues Plaintiff is a "public figure" who must prove actual malice by clear and convincing evidence. Image Mem. at 10-11, 17-18. This argument fails as a matter of law. Plaintiff is a private figure operating a religious ministry. He is not a public official or public figure who has voluntarily thrust himself into public controversy. The Complaint has pointed out that his upward trajectory was disturbed in 2009, but even at his greatest popularity, he never received more than hundreds to 1000 hits on his website per day.

In *Gertz v. Robert Welch, Inc*., 418 U.S. 323 (1974), the Supreme Court established that when the plaintiff is a private individual, states may define liability standards less demanding than the "actual malice" standard required for public figures, provided they do not impose liability without fault. Id. at 347. Under Virginia law, private figure plaintiffs must prove only negligence by a preponderance of the evidence, while public figures must prove actual malice by clear and convincing evidence. *Blue Ridge Bank v. Veribanc*, 866 F.2d 681, 686 (4th Cir. 1989).

The Court in *Gertz* recognized three critical distinctions that justify this differential treatment. First, private individuals are more vulnerable to reputational injury. Unlike public figures who have "voluntarily exposed themselves to increased risk of injury from defamatory falsehood," private individuals have "relinquished no part of [their] interest in the protection of [their] own good name." *Gertz,* 418 U.S. at 344-45.

Second, private individuals lack effective means of rebuttal. Public officials and public figures "usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy." Id. at 344. Private figures cannot effectively respond to

defamation through media channels, making them "more vulnerable to injury" and "more deserving of recovery." Id. at 345.

Third, the state has a stronger interest in protecting private figures. The "state interest in compensating injury to the reputation of private individuals requires that a different rule should obtain with respect to them." Id. at 343.

Here, Plaintiff operates a religious ministry website and has never received any fame nor has he received any public attention beyond his ministerial work. Compl. ¶¶ 18-26. He is not a public official, has never held public office, and has not "thrust [him]sel[f] to the forefront of particular public controversies in order to influence the resolution of the issues involved" Gertz v. Robert Welch, 418 U.S. 323, 345. Plaintiff's religious ministry lacks the "pervasive fame or notoriety" and "special prominence in the resolution of public questions" required for public figure status. Compl. ¶ 25; *Blue Ridge Bank*, 866 F.2d at 686.

Under *Gertz* and *Blue Ridge Bank*, Plaintiff is clearly a private figure entitled to the heightened protection Virginia law affords such plaintiffs. This means Plaintiff need only prove negligence -- not actual malice -- to establish liability. The circumstantial evidence in the Complaint easily satisfies negligence.

## V. IMAGE'S STATUTE OF LIMITATIONS ARGUMENT FAILS

### A. Virginia Code § 8.01-40 Has a Five-Year Statute of Limitations

Image correctly states that Virginia Code § 8.01-40 has a five-year statute of limitations. Image Mem. at 21-22. Image argues, however, that Plaintiff's claim is time-barred because "Plaintiff alleges Defendant Image Comics ceased publishing The Walking Dead in 2019." Image Mem. at 22.

This argument fails for three reasons.

**B. Plaintiff's Complaint Alleges Ongoing Commercial Exploitation Through 2025**

First, Plaintiff's Complaint expressly alleges that "Defendants' commercial use of Plaintiff's name has continued through the present day via ongoing digital sales, reprints, video game operations (through November 2024), streaming platforms, and continued distribution of comic books and related media featuring the Thomas Richards character." Compl. ¶ 101. Plaintiff further alleges ongoing harm evidenced by "receiving ongoing Google Alerts throughout 2024-2025 notifying him of new online content referencing the fictional Thomas Richards character." Compl. ¶ 103.

These allegations encompass Image Comics' continuing commercial exploitation through republication, digital distribution, and licensing arrangements that extend well within the five-year limitations period for § 8.01-40 claims.

**C. Image Comics Jointly Published The Walking Dead in September 2023**

Second, and most significantly, Image Comics **did not** cease its involvement in 2019. Investigation following Image's motion reveals that Image Comics actively republished The Walking Dead in **September 2023** through jointly-published limited edition box sets.

On September 22, 2023, a press release published on Image Comics' official website (imagecomics.com) announced "The Walking Dead 20th Anniversary Box Sets." The press release identifies the publisher as "**Image Comics/Skybound Entertainment**" - not Skybound alone, but **joint publication** by both entities.

**Eric Stephenson, Publisher and Chief Creative Officer at Image Comics**, is quoted in the press release stating: "When we first launched The Walking Dead in 2003, no one could have guessed that it would go on to become one of our most successful series ever, let alone an international cultural phenomenon, but the stories collected in these four box sets serve as an

excellent reminder of not only the series' broad appeal, but the talent and commitment of Robert Kirkman and his various collaborators." [**See Exhibit A - Image Comics Press Release, Sept. 22, 2023**]

The press release announces four box sets containing volumes 1-32 of The Walking Dead, released October 3-24, 2023, and sold through major retailers including Amazon, Barnes & Noble, Books-a-Million, and Indigo. The Thomas Richards character appears in issues 13-20, included in Box Set #2.

This September/October 2023 joint publication by Image Comics and Skybound Entertainment falls **well within** the five-year statute of limitations for § 8.01-40 claims. Plaintiff filed this action September 4, 2025 - within two years of Image's 2023 republication.

### D. Image's Own Press Release Proves Ongoing Partnership With Skybound

Third, Image cannot claim it "ceased publishing" in 2019 when:

- Its own Publisher celebrated a 2023 joint publication

- The press release identifies "Image Comics/Skybound Entertainment" as joint publishers

- Image's Publisher provided promotional quotes for the 2023 release

- The press release describes Skybound as maintaining "key partnerships across the entertainment industry including Universal Pictures and **Image Comics**" (present tense)

This is not a historical reference. It describes an **ongoing business relationship** as of September 2023.

**E. The 2023 Publication Was Active Commercial Exploitation**

Image's 2023 republication was not passive availability of old content. Image Comics made active commercial decisions to:

- Create new physical products (limited edition box sets with new packaging and ISBNs)

- Market them nationally through major retailers

- Issue press releases celebrating the commercial release

- Generate new revenue from content containing Plaintiff's unauthorized name

Under *Myska v. RMS Techs*., 25 Va. Cir. 344, 346 (1991), the manner in which the tort was executed controls the analysis of whether conduct constitutes a new publication. Image's September 2023 decision to create, market, and distribute new physical products constitutes a separate commercial exploitation occurring within the limitations period for **the causes of action** - defamation (arguably) and § 8.01-40 (clearly).

**F. Plaintiff's Complaint Provides Sufficient Notice of Post-2019 Claims**

Image argues that "Plaintiff does not allege any connection between any later publications and Defendant Image Comics." Image Mem. at 22. This is incorrect.

Plaintiff's Complaint alleges:

- "Defendants' commercial use... **has continued through the present day** via ongoing digital sales, **reprints**... and **continued distribution of comic books**" (Compl. ¶ 101)

- "The defamatory content **continues to be distributed through reprints, digital editions**" (Compl. ¶ 57)

- Ongoing Google Alerts "throughout 2024-2025" documenting continuing exploitation (Compl. ¶ 103)

These allegations provide notice of claims based on continuing commercial exploitation. The September 2023 Image Comics/Skybound joint publication - documented by Image's own press release - falls squarely within these allegations.

Moreover, Federal Rule of Civil Procedure 15(a)(2) provides that "the court should freely give leave [to amend] when justice so requires." If the Court finds the 2023 press release constitutes matter outside the pleadings requiring additional specificity, Plaintiff respectfully requests leave to amend to specifically allege Image's September 2023 joint publication. Such amendment would relate back to the original filing under Rule 15(c)(1)(B) because it "asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out -- or attempted to be set out -- in the original pleading," namely Image Comics' continuing commercial exploitation of Plaintiff's name.

## G. Discovery Will Reveal Additional Image Comics Publications and Authorizations

Plaintiff reserves the right to establish through discovery:

- Additional Image Comics publications or authorizations between 2019-2024

- Image Comics' financial interest in Skybound's ongoing exploitation

- Image Comics' role in licensing to Scopely, streaming platforms, and other third parties

- Specific dates and terms of digital distribution agreements

- Internal communications regarding the 2023 box sets and ongoing commercial strategy

At the motion to dismiss stage, Plaintiff need only allege facts making liability plausible. The existence of:

- Image's own September 2023 joint publication (documented by Image's press release)

- Plaintiff's allegations of ongoing commercial exploitation (Compl. ¶¶ 57, 101, 103)

- The five-year statute of limitations for § 8.01-40 claims

These factors defeat Image's premature statute of limitations argument.

## H. Even If Defamation Claims Were Time-Barred, § 8.01-40 Claim Survives

Finally, even if the Court were to find that some defamation claims arising from the 2004 original publication are time-barred (which Plaintiff disputes), the § 8.01-40 claims remain timely based on:

- The 2023 Image Comics/Skybound joint publication

- Ongoing digital distribution and licensing (2019-2025)

- Continuing commercial exploitation across multiple platforms

These claims are based on the same underlying conduct, seek the same relief, and would proceed to discovery regardless of the defamation claims' status.

## VI. PLAINTIFF HAS ADEQUATELY PLED ALL CLAIMS

## A. Defamation (Count I)

## 1. Kirkman's Pattern Establishes 'Of and Concerning' Plaintiff

Image argues Plaintiff has not adequately alleged the character is "of and concerning" him.
Image Mem. at 18-20. But Plaintiff has alleged far more than mere name similarity: (1) exact
full name: 'Thomas Richards' is Plaintiff's complete, exact name (Compl. ¶ 26); (2) specific
identifying detail: the character's false tax fraud claim mirrors Plaintiff's documented Tony
Alamo association (Compl. ¶¶ 23, 56); (3) Kirkman's admitted pattern: he publicly admits
naming villains after real people he dislikes and draws names from "people I remember"
(Compl. ¶¶ 40-50); (4) unusual use of last name: Kirkman broke his stated aversion to
creating last names (Compl. ¶¶ 45-47); (5) statistical improbability: the combination of exact
name plus specific identifying detail makes coincidence implausible (Compl. ¶¶ 70-73); (6)
timing and ideological opposition: created in 2004 when Plaintiff had significant online
visibility (Compl. ¶ 37); and (7) AMC's avoidance: television adaptation deliberately changed
the name and introduced benign "Richards" characters (Compl. ¶¶ 61-64).

The Virginia standard confirms Plaintiff has met his burden. In *Rush v. Worrell Enterprises*,
21 Va. Cir. 203, 208 (1990), the court held that "the test is not whom the story intends to
name, but who a part of the audience may reasonably think is named -- not who is meant but
who is hit." The court allowed plaintiff to proceed past summary judgment despite the
defendant having no intent to target him and the article containing no identifying details
beyond the shared name.

The mathematical reality is inescapable: Kirkman was targeting SOME specific Thomas
Richards. A creator who admits he names villains after "people I remember" and who breaks
his stated aversion to creating last names to use a complete first-and-last-name combination is
not generating names randomly. The question is not WHETHER Kirkman selected a real
person, but WHICH real Thomas Richards he selected.

The identifying details answer that question. During 2003-2004, Plaintiff was:

- Operating a prominent religious website receiving hundreds to ~1,000 daily visitors (Compl. ¶ 37)

- **Publicly supporting Tony Alamo, a nationally famous religious figure and celebrity jacket designer (Elvis Presley, Michael Jackson) whose 1994 tax fraud conviction was national news and whose story appeared in President Bill Clinton's 2004 autobiography "My Life"** (Compl. ¶¶ 23, 56 n.34) **and whose continued notoriety is evidenced by mainstream media featuring him in headline news coverage as recently as November 2025** (Compl. ¶¶ 23, 56 n.34; **Exhibit B**)

- Teaching biblical truth in direct ideological opposition to Kirkman's atheism and Jesus-mockery (Compl. ¶¶ 28-31)

- Featured prominently in Tony Alamo's internationally distributed newsletter (October 1997 issue which continues to be displayed and distributed) with his photograph and full name "Tommy Richards, Long Island, NY" on the front cover, distributed "by the millions" to "over two hundred countries," and remaining publicly accessible online through the present day (Exhibits C & D)

The tax fraud detail was not a random selection from among possible criminal charges. It was a specific reference to Plaintiff's then-current, publicly visible association with a tax-fraud-convicted religious leader. By depicting the fictional Thomas Richards as LYING about tax fraud to conceal worse violent crimes, Kirkman was making a pointed statement about the real-life tax evader Alamo – implying that he was involved with far more evil crimes.

This level of specificity eliminates any plausible coincidence theory. The combination of exact name + current biographical detail + ideological opposition + timing identifies Plaintiff as the specific Thomas Richards Kirkman targeted.

Image dismisses these allegations as "implausible" coincidence without offering any explanation for how such a coincidence could occur. Image Mem. at 2-5. Common sense - and basic probability theory - establishes that when independent identifying factors combine (exact full name + specific biographical detail + admitted pattern of naming after "people I remember" + aversion to creating last names + ideological opposition + timing), random occurrence becomes vanishingly unlikely. Image provides no statistical analysis supporting their "coincidence" theory and no alternative explanation for the name selection. Their speculation cannot overcome Plaintiff's detailed factual allegations supported by Kirkman's own public statements.

## 2. Plaintiff Has Adequately Identified Defamatory Content

Image claims Plaintiff failed to identify specific defamatory statements. Image Mem. at 19-20. But Plaintiff has alleged that the character: is "portrayed as a psychopathic serial killer" (Compl. ¶ 54); "brutally murders multiple people, including minors" (Compl. ¶ 54); "exhibits sadistic and depraved behavior" (Compl. ¶ 54); and "lies about being imprisoned for tax fraud to conceal his true violent nature" (Compl. ¶ 54).

Federal courts do not require verbatim quotation of allegedly defamatory statements at the pleading stage. In *King v. Chaffin*, 759 F. Supp. 3d 690, 696 (W.D.N.C. 2024), the court held that plaintiffs stated a defamation claim with sufficient particularity, even though "Plaintiffs' allegations do not specify the time, place, and recipient of each defamatory statement." The court noted that defamation claims may proceed where plaintiffs provide "defined categories of statements which provide reasonable notice to the parties."

## 3. Image's Cases Are Distinguishable

Every case Image cites involves situations where: (1) no evidence creator knew plaintiff; (2) no pattern of targeting real people; (3) no specific identifying details beyond name; and (4)

no public admissions about intent. None of these cases involved a creator who publicly admits targeting real people through villains.

By contrast, courts have allowed defamation claims to proceed where plaintiffs alleged facts similar to those here. In *Bindrim v. Mitchell*, 92 Cal. App. 3d 61 (1979), a psychologist recovered damages where a novel depicted nude therapy sessions he conducted. The author attempted to disguise the character by changing the name to "Dr. Simon Herford," giving him a completely different physical appearance, and changing his profession. Id. at 75-76. Despite these deliberate efforts at concealment, the court held plaintiff was identifiable because "the test is whether a reasonable person, reading the book, would understand that the fictional character therein pictured was, in actual fact, the plaintiff acting as described." Id. at 78.

Here, Plaintiff has alleged even stronger grounds for identification than existed in Bindrim: exact name match (unlike *Bindrim* where name was changed); specific identifying detail matching Plaintiff's Tony Alamo association; creator's admitted pattern of naming villains after "people I remember"; industry recognition through AMC's name change; and ideological opposition over religious content.

Similarly, in *Geisler v. Petrocelli*, 616 F.2d 636 (2d Cir. 1980), the Second Circuit reversed dismissal where the author wrote a novel featuring a character with plaintiff's exact name and similar physical characteristics. The court held plaintiff was "entitled to develop and present a full evidentiary record" on whether readers would identify her with the character. Id. at 640.[10]

---

[10] *Geisler* was decided under the pre-*Twombly* pleading standard of *Conley v. Gibson*, 355 U.S. 41 (1957), which has since been superseded. However, the court's substantive holding regarding the "of and concerning" requirement in defamation cases—that identification need only be apparent to those who knew plaintiff—remains valid law. Moreover, Plaintiff here satisfies even the heightened *Twombly/Iqbal* plausibility standard through allegations of: (1) exact name match, not mere similarity; (2) specific tax fraud identifier matching Plaintiff's documented association with Tony Alamo (Compl. ¶¶ 23, 56); (3) Kirkman's admitted pattern of naming villains after "people I remember" (Compl. ¶¶ 40-50); (4) ideological opposition over religious content (Compl. ¶¶ 28, 31); (5) timing during Plaintiff's significant online visibility (Compl. ¶¶ 34-39); and (6) AMC's deliberate name change for television (Compl. ¶ 61). **These factual allegations, which exceed those in *Geisler*, make intentional targeting plausible under current pleading standards.**

**B. Violation of Va. Code § 8.01-40 (Count II)**

Image argues the right of publicity claim fails. Image Mem. at 21-22. This argument

misunderstands both the statute and Plaintiff's allegations.

**1. Discovery Will Reveal Whether Kirkman Intentionally Targeted Plaintiff**

Plaintiff is entitled to discovery on whether Defendants intentionally used his name. Kirkman

has publicly stated that he: names villains after "people I remember" (Compl. ¶¶ 40-50);

creates villain characters based on real people he dislikes (Compl. ¶¶ 40-50); and invites his

audience to identify the real people behind his villains (Compl. ¶ 50).

Discovery is needed to determine: How did Kirkman select "Thomas Richards" as a character

name? Did he research Plaintiff? Did he know of Plaintiff's association with Tony Alamo and

tax fraud claims? Why did AMC change the character's name for television? Internal

communications may reveal AMC recognized the character targeted Plaintiff. (Compl. ¶ 61)

**2. The Harm Is Real, Measurable, and Ongoing**

Va. Code § 8.01-40 exists precisely to prevent the type of harm Defendants have inflicted on

Plaintiff. This harm is not speculative -- it is empirically demonstrated and documented

across multiple areas of law.

**Trademark law recognizes that negative name associations cause measurable,**

**substantial harm.** In *VIP Prods., LLC v. Jack Daniel's Props.*, 291 F. Supp. 3d 891 (D. Ariz.

2018), the court credited expert testimony showing that associating Jack Daniel's whiskey

with dog feces through a parody product was "likely to tarnish the mark by creating negative

consumer associations" that "undermine the positive associations that Jack Daniel's has

created." The court emphasized that such negative associations cause reputational harm

cognizable under federal trademark law. See also *American Dairy Queen Corp. v. New Line

Prods.*, 35 F. Supp. 2d 727 (D. Minn. 1998) (granting preliminary injunction where film title

would "create negative impressions…thereby demeaning and disparaging its mark"); *Harris Research, Inc. v. Lydon*, 505 F. Supp. 2d 1161 (D. Utah 2007) (finding tarnishment where use created "negative association" harming trademark reputation).

**If negative associations harm multi-billion-dollar corporate trademarks, they necessarily harm individuals.** Trademark dilution law protects commercial brands from reputational damage caused by negative associations. The same psychological mechanism - unconscious linking between a name and negative content - operates when Defendants associate Plaintiff's personal name with a psychopathic wife and child-murderer across comic books, video games, and streaming platforms.

Image argues Plaintiff cannot recover $25 million because his ministry offers free content. Image Mem. at 12. This fundamentally misunderstands both Va. Code § 8.01-40 and modern digital content economics.

**First, "free content" does not mean "no commercial value."** Millions of content creators offer free access while monetizing through advertising revenue, sponsored content, affiliate marketing, premium memberships, speaking engagements, product sales, and other revenue streams. Plaintiff's decision to make biblical teachings freely accessible does not waive his right to control commercial exploitation of his name and identity. Many of the most valuable digital properties - from Google to Facebook to YouTube - offer "free" content while generating billions in revenue.

**Second, the statute prohibits DEFENDANTS' unauthorized commercial use - not interference with Plaintiff's commerce.** Va. Code § 8.01-40 protects against unauthorized appropriation "for advertising purposes or for the purposes of trade." Defendants commercially exploited Plaintiff's name across comic books, video games, and streaming platforms, generating millions in revenue over twenty years. The measure of damages is

DEFENDANTS' unjust enrichment from unauthorized use, not Plaintiff's lost revenue. A copyright infringer cannot escape liability by arguing the victim distributed some works for free.

**Third, reputational harm exists independently of commercial revenue.** A minister, teacher, nonprofit leader, or public figure has a valuable reputation even when offering services without charge. Being systematically associated with a psychopathic child-murderer damages that reputation and interferes with Plaintiff's ability to fulfill his ministerial calling - regardless of whether he charges for that ministry. The harm is to identity, reputation, and life's work, not merely to a revenue stream.

**Sustained negative associations with names cause measurable, documented societal harm.** Following Hurricane Katrina, the name "Katrina" plummeted 85% (from 1,327 babies in 2005 to 193 in 2017) and disappeared entirely from Louisiana birth records after 2006. Compl. ¶ 78. This societal behavior confirms what Virginia law codifies in Va. Code § 8.01-40: unauthorized commercial use of a person's name causes real, compensable harm.

When Defendants systematically associate Plaintiff's name with a psychopathic murderer across comic books, video games, streaming platforms, and fan databases - generating millions in revenue over twenty years - they inflict precisely the harm the statute prohibits. This is not theoretical injury. It is the same reputational damage that trademark law recognizes in the corporate context, applied to an individual whose name has been commercially exploited without consent.

### 3. Continuing Violations Are Adequately Pled

Plaintiff has alleged specific ongoing commercial exploitation: streaming platform availability (ongoing); digital edition sales (ongoing); game collections sold through 2024;

third-party licensing (ongoing); and wiki and database maintenance (ongoing). Compl. ¶¶ 101-103. Each represents a fresh commercial use of Plaintiff's name within the statute of limitations.

## VII. DEFENDANTS' REFUSAL TO DENY INTENTIONAL TARGETING PRECLUDES DISMISSAL

Most tellingly, neither Kirkman nor Image deny the core allegation. Despite multiple opportunities -- in their motions, in public statements, through sophisticated counsel -- Defendants have never stated that Kirkman did NOT intentionally select Plaintiff's name. This conspicuous silence, combined with Kirkman's public admissions about targeting real people through villainous characters (Compl. ¶¶ 40-50), compels the inference that denial is impossible because the targeting was deliberate.

This silence is particularly telling given the timing. Kirkman's motion was filed first and served on Plaintiff before Image's motion was due. Image Mem. at 1 (filed November 3, 2025, three days after Kirkman's October 31, 2025 motion). Image's counsel thus had the opportunity to see Kirkman's refusal to deny targeting before drafting their own brief, yet they similarly refuse to deny the core allegation. Two sophisticated law firms, given every opportunity to state "Kirkman did not intentionally target Plaintiff," instead argue only technical defenses. This coordinated silence speaks volumes.

At the motion to dismiss stage, Plaintiff's allegations must be accepted as true and all reasonable inferences drawn in his favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plaintiff has alleged specific, non-conclusory facts establishing intentional targeting. Compl. ¶¶ 40-73. Whether Kirkman encountered Plaintiff's prominent website while researching character names is a factual question that cannot be resolved without discovery.

Defendants possess all evidence necessary to prove or disprove intentional targeting: Kirkman's character development materials from 2003-2004, research materials about religious websites, internal editorial communications about character naming, and -- most significantly -- communications about AMC's decision to change the character's name for television. Why did AMC change "Thomas Richards" to "Tomas" if the original naming was innocent coincidence? Compl. ¶ 61. This evidence exists exclusively in Defendants' and AMC's possession.

Courts recognize that a defendant's state of mind, editorial decisions, and research process are discoverable to establish intent. In *Herbert v. Lando*, 441 U.S. 153, 160 (1979), the Supreme Court held that plaintiffs may inquire into the editorial process and defendant's thoughts, opinions, and conclusions to prove state of mind, rejecting claims of editorial privilege.

Dismissal at this stage would deprive Plaintiff of the opportunity to prove what Defendants refuse to deny. Plaintiff is entitled to test Defendants' silence through discovery.

**CONCLUSION**

Image had every opportunity to deny that Kirkman intentionally named a villainous character after Plaintiff. They chose not to. That silence, combined with Kirkman's public admissions about his targeting practices, compels the inference that the targeting was deliberate.

This case will determine whether creators can publicly announce they use fiction to target real people and then hide behind "it's just fiction" when sued. The answer should be no.

Plaintiff has alleged far more than Image's motion acknowledges: exact name match, specific identifier, admitted targeting pattern, ideological opposition, timing, and industry recognition through AMC's name change. These allegations, accepted as true and construed in Plaintiff's favor, easily survive a motion to dismiss.

Image's statute of limitations defense fails as a matter of law. Defendants' continuing commercial exploitation across multiple platforms -- from mobile games updated through November 2024 to ongoing streaming licenses -- creates continuing violations. Whether these constitute separate actionable uses under *Myska* or mere continuing effects is a factual question that cannot be resolved at this stage.

At minimum, disputed factual questions preclude dismissal: Did Kirkman know of Plaintiff's website during character development? Why did AMC change the character's name? What internal communications exist about character naming? These questions require discovery, not dismissal.

The motion to dismiss should be denied.

DATED: November 17, 2025

Respectfully Submitted,


/s/ Lisa Weingarten Richards

Lisa Weingarten Richards

LWR Law Offices

3060 Williams Dr, Ste 300 #510

Fairfax, VA 22031

Tel.: (202) 981-2059

lwr@lwrlawoffices.com

VSB #96671

Counsel for Plaintiff


## CERTIFICATE OF SERVICE

I hereby certify that on November 17, 2025, a true and correct copy of the foregoing

document was served upon all parties of record via the Court's ECF system.


/s/ Lisa Weingarten Richards

Lisa Weingarten Richards